## CRAIG et al. v. UNITED STATES. *
### Nos. 7862, 7863.

Circuit Court of Appeals, Ninth Circuit.
Feb. 10, 1936.

*Rehearing denied April 20, 1936. See — F.(2d) — . L. Ed. — .

818

Ames Peterson, Mark L. Herron, A. I. McCormick, Paul D. McCormick, and Gavin W. Craig, all of Los Angeles, Cal., and Henderson Stockton, of Phœnix, Ariz., for appellant Craig.

Hugo H. Harris, of Los Angeles, Cal., for appellant Weinblatt.

Peirson M. Hall, U. S. Atty., and Charles H. Carr and M. G. Gallaher, Asst. U. S. Attys., all of Los Angeles, Cal.

Before GARRECHT, DENMAN, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

On December 19, 1934, an indictment was returned in the court below against the appellants and Helen Werner. This accusation, which will be hereinafter referred to as the first indictment, contained two counts, each charging a violation of 18 U.S.C.A. § 88. The first count alleged that the defendants had conspired to secure, by corrupt means, dismissal of an indictment and prosecution in which John McKeon and others were charged with violations of 18 U.S.C.A. § 338, or using the mails in execution of a scheme to defraud, and with a violation of 18 U.S.C.A. § 88, the conspiracy statute. The judgment of conviction in the prosecu-

tion under the postal laws, hereinafter referred to as the Italo Case, was reversed by this court in a decision handed down on November 8, 1935. Wilkes v. United States, 80 F.(2d) 285.

The second count of the first indictment charged the same defendants with conspiring to obstruct justice by unlawfully securing the dismissal of the Italo Case, referred to in the first count; such dismissal·to be brought about by giving money and other things of value to the same federal officials as those named in the first count. The second count alleged the same overt acts that were set out in the first count.

At the trial under this first indictment, after all the evidence had been introduced and both sides had rested and before the arguments of counsel to the jury, the defense moved ·to require the government to elect upon which count it would proceed. In that connection, the following occurred:

"Mr. Herron: I, at this time, desire to renew the motion made to compel the Government to elect to further proceed upon one or the other count of the indictment, rather than upon both counts.

"The Court: What do you say about that, Mr. Carr?

"Mr. Carr: Why, if your Honor please, I think there might be some merit in that, and there might be some question that the two counts are very similar, and for that reason, the Government would be willing to proceed on the second count.

"The Court: The Government elects to proceed on the second count?

"Mr. Carr: Yes, sir.

"The Court: The Government proceeds on count 2, and count 1 is dismissed.

"Mr. Herron: I now desire—

"The Court: (Interrupting) Or, rather, instead of dismissing, judgment entered in favor of the defendants on count 1.

"Mr. Herron: That is, the jury will be instructed to do that, or—

"The Court: (Interrupting) No, that is not necessary.

"Proceed."

The jury failed to agree on a verdict on the second count, and was discharged.

On March 14, 1935, the grand jury returned another indictment against the

same defendants in the court below. This charge, to which we will hereinafter refer as the second indictment, involved the same transaction as the first indictment. There had been an indictment preceding the one to which we are referring as the first, but it is not here necessary to consider that earlier indictment.

The second indictment, which is the one involved in the present appeal, was likewise in two counts. The first count charged the defendants with conspiring to obstruct the due administration of justice in the Italo Case by corruptly securing the dismissal of that prosecution by influencing, etc., government officials to dismiss the indictment in that case, etc. It was upon this first count that the conviction now appealed from was had.

The second count charged each of the defendants with doing certain acts in an endeavor to procure corruptly the dismissal of the Italo Case, etc.

Each of the defendants pleaded not guilty, filed a demurrer, both general and special, to both counts of the indictment, entered a plea in bar and a plea of former jeopardy to the first count, and made a motion to quash both counts.

The trial court granted the appellee's motion to strike the plea in bar and of former jeopardy, sustained the defendants' demurrers to the second count, overruled them as to the first count, and denied the defendants' motions to quash the first count, upon which trial was accordingly thereafter had. The jury returned a verdict of not guilty as to Helen Werner and of guilty severally as to the appellants herein. From a judgment entered in accordance with the verdict, the present appeal has been taken.

Arguing in support of their plea in bar and their plea of once in jeopardy, under which they urge the cognate defense of res judicata, the appellants contend that the action of the trial judge in the first case, in entering a judgment in their favor on the first count of the first indictment, was, in effect, an instruction for a verdict in favor of the appellants; that "the mere abandonment of the charge was equivalent to an acquittal"; that the abandonment of count 1 was without the appellants' consent; and, finally, that, since count 1 of the first indictment was the same as count 1 of the present indictment, on which the appellants were

convicted, the above-mentioned pleas should have been sustained.

The appellants, however, are in error when they state that count 1 of the first indictment was dismissed or abandoned without their consent. The very portion of the record quoted by the appellants, and set out above, shows that their counsel renewed "the motion made to compel the Government to elect to further proceed upon one or the other count of the indictment, rather than upon both counts."

■ When a nolle prosequi as to one count is entered with the consent of the defendant, even after all the evidence is in, such dismissal does not operate as a bar to a subsequent indictment for the same offense. United States v. Shoemaker, 27 Fed.Cas. pp. 1067 and 1069, No.16,279; United States v. Farring, 25 Fed.Cas. p. 1052, No.15,075; 16 C.J. § 391, pp. 248, 249; 8 R.C.L. §§ 140, 141, pp. 152, 153.

■ Count 1 of the first indictment was abandoned by the appellee because it was "very similar" to count 2. The jury was unable to agree as to count 2. In other words, as the appellee points out, the issue of fact between the appellee and the appellants as to count 2 was not settled by the jury in that case. The appellants now contend that, since counts 1 and 2 of the first indictment charged the same offense as that charged by the first count of the present indictment, a dismissal of count 1 of the first indictment is a bar to a prosecution under count 1 of the present indictment, even though the first jury was unable to agree on the count that was in fact submitted to it. If this rule were adopted, a defendant confronted by an indictment containing similar counts could wait until the taking of testimony had begun, could then insist upon an election, and, in the event of the jury's disagreement on the count elected, could block a second trial on a similar count on the ground that the former count had been abandoned after jeopardy had commenced. We do not think that such an application of the rule as to former jeopardy is a reasonable one, and we decline to adopt it.

In 8 R.C.L. § 141, supra, the following language is used:

"It may be stated as a general rule that where an indictment is quashed at the instance of the defendant, though after jeopardy has attached, he cannot there-

after plead former jeopardy when placed on trial on another indictment for the same offense. His action in having the indictment quashed constitutes a waiver of his constitutional privilege."

We believe that the court below was correct in granting the appellee's motion to strike the plea in bar and the plea of once in jeopardy.

We turn next to an examination of the demurrers to count 1 of the present indictment, on which the appellants were convicted.

Succinctly stated, the allegations of the count, which is lengthy, are as follows:

On December 15, 1931, there was pending in the United States District Court at Los Angeles, an indictment against John McKeon and others, charging them with violations of sections 37 and 215 of the Federal Penal Code. The appellants and Helen Werner conspired with each other and with John McKeon and Fred L. Wilke, who were not indicted, and with other persons, to endeavor corruptly to influence, obstruct, etc., the due administration of justice in the McKeon proceeding. The conspiracy was to be carried out as follows: The three defendants were to approach McKeon and state to him that they could and would, for a large sum of money, bring about corruptly a dismissal of the indictment against him; that the three defendants "could and would, by means of political influence, things of value, sums of money, or gratuitously, corruptly influence or cause other persons to corruptly influence the decision and action of the persons acting on behalf of the United States in an official function, * * * before whom" the McKeon Case was pending, such influence to be directed toward causing a decision and an action favorable to McKeon and others, without regard to whether or not McKeon and the others were guilty of the crime charged in the pending indictment, and against the interests of the United States; that the three defendants would represent to McKeon that they could and would corruptly bring about a dismissal of the pending indictment, by corruptly influencing and causing others to influence the decision and action of each of such government officials "to do acts in violation of their lawful duty * * * and prevent the conduct and presentation of said criminal prosecution, without regard to the merits thereof; that said defendants would represent * * * to John McKeon and other persons * * * that the defendants could and would, for a large sum of money, corruptly endeavor to, and corruptly influence Samuel M. Shortridge, then United States Senator, to influence said * * * officers to * * * bring about, or permit to be brought about, the dismissal of said prosecution," etc.; that the three defendants would corruptly induce McKeon and others to agree to pay large sums of money to them, so that the defendants might corruptly endeavor to influence, or corruptly cause other persons to endeavor to influence, the decision and action of such officers to do acts in violation of their lawful duty and bring about the dismissal of the prosecution, without regard to its merits; that McKeon and others "would pay to said defendants * * * $50,000.00"; that the three defendants and Fred L. Wilke, an unindicted coconspirator, and others, "would corruptly bring about, or cause to be brought about, the dismissal of said criminal prosecution"; that the three defendants and Wilke and others "would corruptly endeavor to influence, corruptly influence, corruptly cause other persons to endeavor to influence, and to corruptly influence by means of political influence, things of value, sums of money, or gratuitously, and gratuitously, the decision and action of" such officers, in favor of McKeon and others, without regard to the merits, "that is to say, to cause said hereinbefore mentioned officers to dismiss, or cause to be dismissed, said indictment and to do other acts in violation of their lawful duty as such officers."

Ten overt acts are set out in connection with count 1.

The federal conspiracy statute, 18 U.S.C.A. § 88, under which the appellants were indicted, reads as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

The offense that the appellants are charged with having conspired to com-

mit, the obstruction of the due administration of justice, is denounced in 18 U.S.C.A. § 241, in the following language:

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, shall endeavor to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or officer acting as such commissioner or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or officer acting as such commissioner, in the discharge of his duty, or who corruptly or by threats or force, or by any threatening letter or communication, shall influence, obstruct, or impede, or endeavor to influence, obstruct, or impede, the due administration of justice therein, shall be fined not more than $1,000, or imprisoned not more than one year, or both."

The appellants' demurrers set forth nine special grounds of objection against count 1, in addition to the general statement that the indictment does not state facts sufficient to constitute an offense against the United States. In the first assignment of error, which deals with the demurrer, each appellant specifies seven special grounds of objection. In the brief of the appellant Craig, which is adopted, with some additions, by the appellant Weinblatt, the argument against the indictment is divided into three headings. We will consider the points urged in support of the demurrers according to the grouping adopted in the brief.

■ It is first urged that count 1 is insufficient because it fails to charge that the appellants conspired to do any acts that would constitute an obstruction to the administration of justice. We believe that a mere reading of the count at once discloses that it charges a conspiracy to commit an offense against public justice. It alleges that the three defendants conspired with one another and with other persons to endeavor to obstruct, "corruptly," the due administration of justice in the McKeon Case, by stating to McKeon that, for a large sum of money, they could and would bring about corruptly a dismissal of the indictment against him, that they could and would accomplish this in various ways, which are specified, and that they would corruptly influence Senator

Shortridge to aid in the plot. The count further sets forth that the alleged conspirators were in fact planning to bring about, by corrupt means, the dismissal of the prosecution.

In this connection, the appellants complain that, contrary to "an elementary principle of criminal pleading," the indictment fails to state the statutory offense in other than the "generic" terms used in the statute itself. Our view is that, on the contrary, the count in question descends to almost tedious minutiæ in detailing the terms of the conspiracy.

■ Furthermore, it should be borne in mind that the offense which it is charged the appellants conspired to commit need not be stated with that particularity which would be required in an indictment charging the offense itself. Wong Tai v. United States, 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545; Ford v. United States (C.C.A.9) 10 F.(2d) 339, 343, affirmed, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793; Coates v. United States (C.C.A.9) 59 F.(2d) 173, 174; Enrique Rivera v. United States (C.C.A.1) 57 F.(2d) 816, 819.

The details of a conspiracy are worked out and unfolded during its course. It would be holding a pleader to an inordinate degree of exactitude to compel him to allege each step with mathematical accuracy; for, when a plan is hatched, the conspirators themselves do not foresee all its ramifications. In the words of Iago—

"'Tis here, but 'tis confused:
Knavery's plain face is never seen
till used."

■ It is next contended that the indictment does not allege a "completed and unconditional conspiracy to endeavor to obstruct the due administration of justice," in that the "obtaining of a large sum of money" or an agreement to pay such sum to the appellants and Mrs. Werner, "was a condition precedent that must be fulfilled before he [Craig] would agree to endeavor to obstruct the due administration of justice," etc. It is then argued that it nowhere appears in the indictment that the sum of money was ever paid or that any agreement that it would be paid was ever made.

The text of count 1, however, clearly shows that an unconditional conspiracy is charged, the steps for the accomplishment of which are set out with great

822

particularity. It is unqualifiedly alleged that the appellants and Mrs. Werner "conspired" to obstruct justice, and that the conspiracy was to be "carried out" in certain ways, including the payment of $50,-000 by McKeon. The fact that McKeon did not in fact pay the appellants the money does not affect the *existence* of the conspiracy, but simply indicates that the plans of the appellants miscarried as to McKeon's part in the scheme.

"Conspiracy is essentially a crime of intent." Britton v. United States (C.C.A.7) 60 F.(2d) 772, 773, certiorari denied, 287 U.S. 669, 670, 53 S.Ct. 314, 77 L.Ed. 577. The crime here charged was completed when the appellants *agreed* on the scheme detailed elsewhere in count 1. That agreement is unequivocally alleged, and it is "earmarked" by the subsequent particulars to "identify" the specific offense charged, "sufficiently to distinguish it from other similar offenses." Hood v. United States (C.C.A.10) 43 F.(2d) 353. The complete details of the plan, although they need not have been stated, could not possibly have prejudiced the substantial rights of the appellants. Hosier v. United States (C.C.A.5) 64 F.(2d) 657, 658, certiorari denied, 290 U.S. 677, 54 S.Ct. 100, 78 L.Ed. 584.

Nor does the alleged fact that McKeon entered the conspiracy after it was formed by the appellants affect the existence of the general scheme. "Such a conspiracy may be a continuing one; actors may drop out, and others drop in; the details of operation may change from time to time; the members need not know each other, or the part played by others; a member need not know all the details of the plan or the operations; he must, however, know the purpose of the conspiracy and agree to become a party to a plan to effectuate that purpose. A conspiracy is bottomed on an agreement to accomplish an illegal act, and without such agreement there can be no conspiracy; a conspiracy 'is a partnership in criminal purposes.'" Marcante v. United States (C.C.A.10) 49 F.(2d) 156, 157; Johnson v. United States (C.C.A.9) 62 F.(2d) 32, 34.

Finally, it is urged against count 1 that it "charges nothing more than that defendants, without regard to the merits of the Italo Case * * * conspired to bring about the dismissal of the indictment, but without the use of bribery or any other unlawful means." This objection seems to be based chiefly upon the allegation that the appellants were to represent to McKeon that they could corruptly influence the action of United States officials in favor of McKeon and others, in the Italo prosecution, "by means of political influence, things of value, sums of money, *or gratuitously*," and upon a similar allegation, also in count 1, that the appellants would in fact so influence such action, which allegation also contains the words *"and* gratuitously" as well as *"or* gratuitously."

What we have already said regarding microscopic criticism of the details of a conspiracy also applies here. Furthermore, influence may be corruptly exerted upon public officials by means other than political pressure, money, or "other things of value." In a government of laws and not of men, motives of personal favoritism, on whatever grounds such motives may be based, are to be deemed corrupt in the administration of public justice.

Finally, the words "gratuitously" can well be disregarded as surplusage, since enough is "left to make a valid and substantial charge of the crime intended to be charged, no essential part of the case being omitted after the striking out occurs." State v. Currier, 225 Mo. 642, 125 S.W. 461, 463.

Even if an essential averment in an indictment is faulty in form; yet, if it may by fair construction be found within the text, it is sufficient. Miller v. United States (C.C.A.3) 50 F.(2d) 505, 508, certiorari denied, 284 U.S. 651, 52 S.Ct. 31, 76 L.Ed. 552. See, also, 18 U.S.C.A. § 556, Supp., and Louis Piquett v. United States (C.C.A.7) 81 F.(2d) 75, decided on January 2, 1936.

Taking the first count by its four corners, we find that it sufficiently apprises the appellants of the offense charged. Accordingly, we hold that the court below was correct in overruling the demurrers, both general and special.

Next to be considered are the specifications of error dealing with the lower court's denial of motions for a directed verdict in favor of the appellants, made at the close of the appellee's case, and renewed at the close of all the evidence.

Viewed in a light most favorable to the appellee, the gist of the evidence ad-

duced against the appellants was as follows:

On December 4, 1931, an indictment .was returned in the United States District Court for the Southern District of California, Central Division, against McKeon, Alfred G. Wilkes, John M. Perata, James V. Westbrook, and others, charging them with using the mails in execution of a scheme to defraud. Wilkes v. United States, supra. The indictment was pending in that court up to and including May 1, 1933, and is herein referred to as the Italo Case. ·

John McKeon and his two brothers had formed the McKeon Oil Company. In 1927 and 1928 that company merged with the Italo Petroleum Corporation, of which the McKeon brothers became the dominating factors. They lent the Italo company $270,000; the loans being evidenced by promissory notes. In 1932, Clay Carpenter, the receiver of the Italo Corporation, had been directed by the District Judge to bring action "to cancel the $400,000 worth of notes held by the McKeons."

Thomas Wilkes, a brother of A. G. Wilkes, one of the defendants in the Italo Case, had known the appellant Weinblatt for perhaps twenty years. Shortly after the return of the Italo indictment, Thomas Wilkes and Weinblatt had a talk about the affairs of A. G. Wilkes. Thomas Wilkes had started talking about his brother's case with Weinblatt early in the autumn of 1931, when it was before the grand jury. In a conversation held within a month after the return of the Italo indictment, Weinblatt told Wilkes that he could "arrange to fix this matter up so that the case would never come to trial." In answer to Wilkes' question as to how much it would cost, Weinblatt replied, "Approximately $125,000 to $150,000." Weinblatt said that he would like to have a talk with McKeon first. Wilkes asked Weinblatt how the latter was going to handle it, and Weinblatt replied:

"Thru Judge Craig. You know Judge Craig is very strong politically down here, and managed Senator Shortridge's campaign and so forth."

At that time the appellant Craig was a justice of the District Court of Appeal of California.

Wilkes testified that he saw Weinblatt during the first week in January, and that the latter said Judge Craig would handle the matter through Senator Shortridge in Washington, "and that he stood very strong with Judge Craig." Wilkes' testimony continues:

"Later on there was conversation between myself and Weinblatt about communications with Washington, and people going there, and what not. He said on one of my meetings with him that things were getting along all right with Jack McKeon and that a couple of people were getting ready to go to Washington and they had some telephone conversations with Washington," etc.

On one occasion, according to Wilkes' testimony, Weinblatt told him that Craig was in a Mr. Behr's office, and asked Wilkes to drop in there and meet the judge. Wilkes went into Behr's office and was introduced to Craig. Wilkes continued:

"* * * We walked out of the office and down the hallway and they dropped into Mr. Meyers' office; the door was open and Joe and the Judge stepped in the door. I stuck my head in and said, 'Hello' and 'See you later' to Meyers."

John McKeon had known the appellant Weinblatt for several years. Weinblatt called to see McKeon at the latter's office, in the early part of January, 1932, and stated that he could be of some assistance to McKeon in the matter of the indictments. Weinblatt said that he believed that his friend, Judge Craig, might be of help in getting the indictments dismissed. McKeon asked Weinblatt to make an appointment for McKeon to see Craig. In a day or two Weinblatt reported that Craig would see McKeon.

McKeon went with Weinblatt to call on Judge Craig in his chambers. It was McKeon's first meeting with Craig. After introducing McKeon to Craig, Weinblatt retired from the room. As to the conversation that followed, McKeon testified:

"I then said, 'Mr. Weinblatt thinks you might be of some assistance to me in the difficulty I am in.' Judge Craig said he thought perhaps he might; that if he understood the facts right in the case, he did not think the indictments were justified, and if they were properly presented in Washington to the proper authorities, he thought they could be dismissed. I then asked Judge Craig what would be the procedure, and he replied that I would employ a firm of attorneys in very high standing and they would go to Wash-

ington and present the case and he thought the indictments would be dismissed. I asked him what it was going to cost and he stated, 'We are having a hard time raising any money for Senator Shortridge's campaign fund, and he is going to have to spend some money in his election this fall.' I said, 'Well, how much money do you think he should spend or will have to spend?' He said about $125,000. I said, 'If it is a figure like that, I am in no position to talk about it.' I cannot do anything on any figure that size. He said, 'Think it over, and come back and see me, and see what you can do.' At the time of this meeting I had two attorneys representing me in the Italo Case, J. T. O'Connor and Neil McCarthy."

McKeon said on the stand that he had another conversation with Craig:

"About two days after this [first] conversation, I again called on the Judge at his chambers, and at that time I said I felt if the indictments could be dismissed, I would be able to raise $50,000. Judge Craig said that would be all right, if I could raise $60,000, that would be sufficient. I asked him how the money was to be raised or be handled, and he stated $10,000 was to be paid immediately for the services of the attorneys that were going to Washington to present the case, and that the other money could be put in escrow or to be donated to Senator Sam Shortridge. I then said I would go out and attempt to get the money. At neither of the meetings between myself and Judge Craig were the names of any lawyers discussed. I never saw Judge Craig again after this second meeting."

McKeon testified that, a day or two after his first meeting with Craig, McKeon and Weinblatt discussed the possibilities of raising this money. McKeon stated that the only liquid assets he had were some notes due from the Italo company, and asked Weinblatt whether he thought he could discount one of them. Weinblatt replied that he thought he could, and in a day or two McKeon turned over a note to Weinblatt to be discounted. The note, which was introduced in evidence, was for $25,000, was dated August 25, 1930, and was due on December 26, 1930. The payee named was R. S. McKeon or order.

McKeon added that no one intimated that any undue influence was to be used

in bringing about the dismissal of the Italo indictment, but that the matter was to be handled "purely and solely on its merits," etc.

Westbrook, one of the Italo defendants, who was acquitted, seems to have been the first person whom McKeon approached after his conversation with Judge Craig. Westbrook testified that McKeon came to his office on February 11, 1932. and asked him whether he would contribute a sum "to send some people to Washington to fix the Italo Case, this indictment that we were in." According to Westbrook, McKeon stated that he needed $10,000 in cash "to send this party"; that there would be $40,000 due, which was to be put into escrow; that, when the indictment was dismissed as to all defendants, they could go to the escrow and get the $40,000; but that the $10,000 had to be paid in cash. Westbrook's testimony on this point continues as follows:

"I told him I didn't believe that. He did not tell me who the people were; said he was sworn to secrecy, and could not tell me. I placed the date of this conversation because I loaned McKeon $250.00 on that day."

McKeon testified that about February 1, 1932, Weinblatt reported to him that he had presented the note to a Mr. Ramish and thought that Ramish would eventually discount the note for $20,000. Thereafter McKeon saw Weinblatt once or twice a week relative to the discounting of the note, and discussed with him the matter of the dismissal of the Italo Case a great deal.

McKeon further stated on the stand that, after he had given the note to Weinblatt, the latter told him that he and Judge Craig had had to telephone to Washington on several occasions, and that the telephone bill was $80, which Weinblatt said he thought McKeon should pay. McKeon testified that he gave Weinblatt $80, and added:

"We were not making any progress in raising the money, and early in March, 1932, Judge Craig called me at my home and stated that if I was working in good faith, and going ahead with the thing, I must do my part as he had done a good deal of work on it already, and did not want me to make a fool of him. I told him I would be able to let him know in a short time whether I could do anything or not."

It was stipulated between the appellee and the appellants that Weinblatt handled business transactions for Judge Craig, and frequented Judge Craig's chambers on occasions.

Carpenter testified that on March 14, 1932, he called Mrs. Werner on the telephone, and that she said she had just returned from Washington, where she had been with Senator Shortridge almost daily. According to the witness, Mrs. Werner told him that she wanted to see him on a very important matter. An appointment was made for about 3 o'clock that afternoon, at Carpenter's office at Long Beach.

Carpenter's testimony regarding the conference with Craig and Mrs. Werner in Carpenter's private office was in part as follows:

"Mrs. Werner stated that she had just returned from Washington, where she had been with Senator Shortridge, and that the Senator was much distressed because of the predicament of his good friends the McKeon boys, and he was hopeful that I, as receiver, would be able to pay some of their notes, thereby relieving them of their distress, and enabling them to make a defense in the case in which they had been indicted. Mrs. Werner then turned to Craig and said, 'Now, Judge, you can tell Carpenter what your interest is.' Craig then said that he and some associates of his had some land near the Hearst Ranch and they were desirous of having it drilled for oil, and the McKeon boys were desirous of drilling this land, but they would have to have more than $50,000 to do it, and he wanted to know if the notes executed by the Italo Petroleum Corporation, as maker, to the McKeons, as payees, were going to be paid. I told him that information had been given me by the United States District Attorney, Mr. McNabb, under the authority of the Attorney General, which tended to show that the McKeons had taken two and one-half million shares of Italo stock as secret profits which had been divided with the officers and directors of the corporation, and I had been directed by Judge James to bring action to recover for the value of that stock, and to cancel the $400,000 worth of notes held by the McKeons. Craig then stated, 'The McKeons sold their property to the Italo, did they not?' and I replied, 'They did.' He said, 'I don't see how you can reject their payments successfully,' and said that he did not recall that he had ever met the McKeons, and was only interested in the drilling of the land near the Hearst Ranch. He said he believed the McKeons would win the civil case, and would also beat the indictment. I told him that I did not know anything about the indictment, but I did not feel that they would be successful in the civil cause. He asked who was my counsel in the civil cause, and I told him R. G. Swaffield. He said he knew Swaffield and would get in touch with him to find out what his attitude was toward paying the notes. He left the office and Mrs. Werner remained and said the Shortridge campaign is in distress for money, and she feared the headquarters would have to be closed unless funds were immediately available, and she didn't know where they were coming from; and she asked me not to mention to any one that she and Craig had been to my office."

On that same day, Craig called on Swaffield to inquire about the McKeon notes.

McKeon testified that about the middle of March, 1932, he went to San Francisco and called on several of the defendants in the Italo Case, asking them to meet him at the Stewart Hotel "on a Sunday between the 10th and 14th of March." McKeon told those present that "I had been working on this matter along the lines I had been working, and that it had gotten to a point where this money had to be provided, and I wanted them to assist me in getting the money."

Perata, who had been president of the Italo Corporation in 1931, and who was one of the Italo defendants who attended the San Francisco meeting, testified:

"At that time McKeon said that he had been contacted by a man in reference to getting the Italo case adjusted, fixing the case up, or about fixing the case, and that they wanted in the neighborhood of $110,000 or $100,000, and after speaking about it, they wanted something in the neighborhood of $50,000. McKeon did not tell us who the people were. He never mentioned any names. * * *

"McKeon at the meeting said that he had been contacted by a man in Los Angeles about the case."

McKeon told his codefendants that he wanted them to get $50,000, "the money that was to go into Senator Shortridge's campaign fund," according to his testi-

mony. McKeon also testified that he thought that Horace Brown was to raise $5,000; Perata $10,000; Wilkes, $20,000, already pledged, before the meeting; Axton Jones, $5,000; and Fred Shingle, "what money he could." McKeon likewise said on the stand:

"None of the persons present at this meeting positively said that they would raise any money, but they were making arrangements as to how they would raise it."

Horace J. Brown, another Italo defendant, testified that at the meeting McKeon stated: "That he had been in contact with some person in Los Angeles, apparently of some importance and influence whose name he did not reveal; that this person had become interested in the Italo Case, and from investigation or knowledge of it, thought we had been improperly indicted; that there was not any demand on the part of the stockholders of the Italo Corporation, or other persons interested for the indictment of anybody; that behind the indictment were other influences, and he thought if this matter could be properly laid before the authorities in Washington, the case could be dismissed."

After the Stewart Hotel meeting, McKeon left San Francisco, went to Sacramento, where he stayed several days, and arrived back in Los Angeles on the following Saturday, March 19, according to McKeon's testimony, which continued as follows:

"On the morning of my arrival, I called Judge Craig by telephone, and told him I was ready to go ahead with my end of the proposition, and I asked him if I could come over and see him. He said he would call me at two o'clock at my home, and let me know what to do. At two o'clock he called me and told me that Weinblatt would call on me Monday morning and talk the matter over.

"Weinblatt called on the following Monday morning at my office and told me that Judge Craig had said that the business from there on would be carried on between Weinblatt and myself, and that I was not to see Judge Craig any more."

McKeon testified that on the same day, March 19, 1932, he asked Weinblatt to return the Italo note that he had given to Weinblatt to discount, and that Weinblatt returned the note to him about March 23 or 24. McKeon also stated on the stand that, when he received the note back from Weinblatt, he told the latter that they would make no further efforts "along that line at all, and that closed up the whole affair as far as I was concerned."

The appellants devote a large part of their main brief to the contention that John McKeon, the principal witness for the appellee, "was impeached in every way known to the law except by character witnesses," and it is "settled law that an accomplice whose testimony has been seriously impeached must be corroborated, substantially, in order that his testimony can sustain a conviction."

The weight of authority does not sustain the appellants' position. In Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 198, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168, the court said:

"It is urged as a further ground of reversal of the judgments below that the trial court did not instruct the jury that the testimony of the two girls was that of accomplices, and to be received with great caution and believed only when corroborated by other testimony adduced in the case. We agree with the Circuit Court of Appeals [Hays v. U. S., 231 F. 106] that the requests in the form made should not have been given. In Holmgren v. United States, 217 U.S. 509, 30 S.Ct. 588, 54 L.Ed. 861, 19 Ann.Cas. 778, this court refused to reverse a judgment for failure to give an instruction of this general character, while saying that it was the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to such evidence. While this is so, there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them. [Authorities cited.]"

This court was governed by the same doctrine in the case of Kuhn v. United States, 24 F.(2d) 910, 914, certiorari denied, 278 U.S. 605, 606, 49 S.Ct. 11, 73 L.Ed. 533, in which the late Judge Dietrich used the following language:

"The other contention made under this branch of the case is that it was error to permit Borresen to testify as to declarations made by defendants, particularly Chew Fook Gum, in the course of the alleged conspiracy, upon the ground, as argued, that Borresen's direct testimony

(which, if believed, undoubtedly made out a case of conspiracy) was so 'discredited' that it could not be accepted as sufficient for that purpose. But, even though he was an accomplice, and may have made some inconsistent statements, the trial court could with entire propriety accept his testimony as making a prima facie case, and proceed accordingly in the reception of other proofs, leaving the ultimate question of his credibility and of the weight of all the evidence to the jury under appropriate instructions."

In the instant case, the court below correctly instructed the jury on the subject of accomplices' testimony in the following language:

"The fact that the Witness McKeon has been convicted of a felony you may

"Under the charge in the indictment consider in respect to his credibility as a witness.

he would be known as an accomplice of the other defendants charged in the indictment, and the testimony of an accomplice should be scrutinized carefully by the jury, and you should act upon the testimony of an accomplice with caution and care."

Indeed, numerous expressions in the main brief of the appellants indicate that they have lost sight of the function of this court in reviewing a criminal case. Thus we are told that McKeon's "animus * * * requires that his entire testimony be weighed and tested," etc.; that "the testimony of Mrs. Werner and of Judge Craig is far more believable than that of Carpenter"; and that "the prosecution has used a witness of utter lack of reliability and utter unfitness," etc. There are many other similar discussions in the brief, dealing with "the key to the truth," a comparison of Carpenter's testimony with Mrs. Werner's, a comparison of Craig's testimony with that of Carpenter, a comparison even of the *characters* of Craig and some of the appellee's witnesses.

Again, referring to the testimony of Thomas Wilkes, the appellants say:

"* * * His rambling, disconnected, uncertain, egotistical, improbable statements, just as he gave them, will be enough to satisfy the reader that his testimony does not measure up to the standard of that substantial evidence which can be the basis of either a juror's convic-

tion of the truth of a fact in dispute *beyond reasonable doubt, or such a belief in the mind of an Appellate Court."* (Italics our own.)

Here again we believe that the appellants, despite their correct statement of the rule elsewhere in their brief, have overlooked the true function of this court. To sustain a conviction, we need not be convinced *beyond reasonable doubt* that the defendant is guilty: it is sufficient if there is in the record substantial evidence to sustain the verdict.

In Felder v. United States (C.C.A.2) 9 F.(2d) 872, 875, certiorari denied, 270 U.S. 648, 46 S.Ct. 348, 70 L.Ed. 779, the court said:

"That we cannot investigate it [the testimony] to pass on the weight of the evidence is a point too often decided to need citation; nor can we, after investigation, use such doubts as may assail us to disturb the verdict of the jury. *That reasonable doubt which often prevents conviction must be the jury's doubt, and not that of any court, either original or appellate.* [Cases cited.] Our duty is but to declare whether the jury had the right to pass on what evidence there was." (Italics our own.)

The correct rule was thus tersely phrased in Humes v. United States, 170 U.S. 210, 212, 213, 18 S.Ct. 602, 603, 42 L.Ed. 1011:

"The alleged fact that the verdict was against the weight of evidence we are precluded from considering, if there was any evidence proper to go to the jury in support of the verdict. [Cases cited.]"

See, also, 17 C.J. 264–269.

In an attempt to contrast Craig's character with those of two of the appellee's witnesses, the appellants' main brief nears its close with the following language:

"Will the Government contend that, weighed against the character of a convicted felon, of an admitted conspirator to obstruct justice, of a man none of whose associates would believe, of a habitual prevaricator and perjuror, the balance is in favor of the latter, and that with no other corroboration than that of another confessed conspirator to prevent [sic] the obstruction of justice, of an obviously confessed embezzler, a man who manifestly admits having returned his

client's money to avoid disbarment, and who puts unbelievable words in a woman political enemy's mouth?"

Similar language concerning the government's witnesses was used by counsel for the defendant in Dimmick v. United States (C.C.A.) 135 F. 257, 262. After quoting a specimen of the denunciation, this court said:

"It is not within the province of this court to interfere with the verdict of the jury upon this ground. The rule is well settled that the credibility of witnesses and the probative force of facts introduced in evidence are the sole province of the jury; that the appellate court cannot weigh the evidence; that the only question before the court is whether there is any legal evidence to sustain the verdict."

The appellants point to that portion of McKeon's testimony in which he stated that he did not "contemplate in any talk with Judge Craig or Mr. Weinblatt that anybody was going to influence the action of the Italo Case other than purely and solely on its merits," etc.

Nevertheless, we have already seen that McKeon did testify that $50,000 was to be put into escrow for Senator Shortridge's campaign, as part of the price to be paid for the dismissal of the Italo indictments. No other construction could reasonably be placed upon the appellant Craig's language, as quoted by McKeon. This testimony of McKeon's is, of course, inconsistent with his statement on cross-examination that "no one intimated, suggested or stated" that "any undue influence other than upon the merits of the case was to be used upon Mr. Mitchell, then Attorney General," or that "any unlawful means whatsoever" was to be used in securing a dismissal of the Italo Case.

▮ The mere fact, however, that a witness' testimony is self-contradictory does not prevent its constituting "substantial evidence" upon which a verdict may be sustained. In Di Carlo v. United States (C.C.A.2) 6 F.(2d) 364, 368, certiorari denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168, Judge Learned Hand held that a jury might believe even a statement not under oath, made by a person who later took the stand and testified inconsistently with his prior unsworn statement:

"The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court."

See, also, Peters v. United States (C.C.A.9) 94 F. 127, 142, 143, certiorari denied, 176 U.S. 684, 20 S.Ct. 1026, 44 L.Ed. 638; 64 C.J. 356, 357, § 343.

▮ A large part of the appellants' briefs, which contain a total of more than 500 pages, might be addressed to a jury more appropriately than to an appellate court. We are not here concerned with the credibility or the comparative reasonableness of testimony; nor is it our function to balance probabilities.

On the facts, the appellants have had their day in court, before a jury. For us now to re-examine those facts would be to give to the appellants an additional day in court, to which they are not entitled.

▮ We hold that, in denying the appellants' motions for a directed verdict, the court below did not commit error.

▮ The appellants complain that it was reversible error for the trial court to allow the appellee to ask John A. Coleman the question:

"Q. I will ask you if at that time Mr. Weinblatt said to you, 'I am a go-between, and my business is fixing.'"

The query related to an asserted conversation between the witness and Weinblatt in the latter part of December, 1932, or the early part of January, 1933.

In permitting the witness to answer, the court instructed the jury that the testimony was to be considered only in connection with Weinblatt, and sustained the objections of the appellant Craig and the defendant Werner.

Thus limited, this testimony, we think, was proper.

On cross-examination, Weinblatt had been asked whether he had made such a statement to Coleman, and had repeatedly and emphatically denied it. On direct examination, Weinblatt had dwelt considerably upon his business of real estate

broker, his discounting of notes, his transactions with Craig, etc. In view of the appellants' theory that Weinblatt's dealings with Craig were of a legitimate business nature, connected with loans, discounts, and real estate transactions, the true character of Weinblatt's business was material in the case, and Weinblatt's testimony on the subject could properly be impeached and contradicted.

In Alford v. United States, 282 U.S. 687, 691–693, 51 S.Ct. 218, 219, 75 L.Ed. 624, the court said:

"Cross-examination of a witness is a matter of right. [Case cited.] Its permissible purposes, among others, are that the witness may be identified with his community so that independent testimony may be sought and offered of his reputation for veracity in his own neighborhood [authorities cited]; that the jury may interpret his testimony in the light reflected upon it by knowledge of his environment [cases cited]; and that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased. [Cases cited.] * * *

"The question, 'Where do you live?' was not only an appropriate preliminary to the cross-examination of the witness, but on its face, without any such declaration of purpose as was made by counsel here, was an essential step in identifying the witness with his environment, to which cross-examination may always be directed. [Authorities cited.]"

See, also, Rice v. United States (C.C.A.1) 251 F. 778, 783, certiorari denied, 248 U.S. 574, 575, 39 S.Ct. 12, 63 L.Ed. 428.

■ The appellants also object to the following statement made by the assistant United States attorney:

"Gentlemen, I wish while I am making this argument you would watch Weinblatt for at least ten minutes, and if you can look at Weinblatt and say you yourselves that you, as a Judge of the Court of Appeals, would be caught out in broad daylight with him, then go out and free Judge Craig.

"If you will remember, when Weinblatt sat on this stand on cross-examination, he got up there with a smile, and he came down with his jaw hanging on the ground. And I will tell you why. He had forgotten that day back there when he said to Coleman, 'I am a go-between and my business is fixing.' That is one time he advertised his wares too often."

On behalf of Weinblatt, objection was made to the "personal nature of that argument," the statement was assigned as misconduct and error, and the court was asked to instruct the jury to disregard it. Whereupon the court made the following statement:

"The jury have the right to consider the demeanor or conduct of the person testifying as a witness in determining the credibility of the witness, but the jury must not consider the looks of a man, or his conduct or demeanor off the witness stand, in determining his guilt or innocence in the case."

In view of Coleman's testimony as to Weinblatt's statement to him and in view of the lower court's careful instruction to the jury that a defendant's personal appearance or his conduct or demeanor off the witness stand is not to be considered in determining his guilt or innocence, we do not think that the prosecutor's remarks, however ill-advised, constitute reversible error. Indeed, the point is not pressed in Weinblatt's brief; while, in their brief, counsel for Craig seem to object to the prosecutor's remarks solely on the ground that reference was made to Coleman's testimony, which they contend was an "attempted impeachment upon a collateral matter."

In the brief of the appellant Weinblatt, it is argued that the trial court committed prejudicial error in refusing to permit Weinblatt to give his opinion concerning the mental condition of the witness Wilkes. Weinblatt testified as follows:

"I heard Tom Wilkes' testimony in this case. I know of an accident that occurred to him. I had been out of contact with Tom Wilkes for several years before the accident. I have been in contact with him after his accident for several years. I have noticed a difference with relation to his attitude towards business matters."

The government objected to this line of testimony, and the objection was sustained. Counsel for Weinblatt then made the following statement to the court:

"We note an exception to that, and offer to show at this time, that from the time of his accident, Mr. Wilkes did not

appear, to this witness, in his business or social relations, as mentally competent or able to recollect affairs, and he was generally loose in his talk and conversation."

The appellant Weinblatt's brief quotes extensively from note, 38 L.R.A. 721, 730, as to the general rule dealing with nonexpert testimony on the question of sanity in criminal cases. Every single paragraph of that quotation, however, deals with the opinion of nonexpert witness regarding the sanity of the *accused*. Not one sentence in the quotation suggests that the *accused*, whose self-interest in the case is obvious, has been permitted to give nonexpert testimony as to the sanity of the prosecution witnesses. Indeed, the very section of L.R.A. from which the brief quotes contains numerous instances in which nonexpert testimony has been declared inadmissible. These are not given in the brief.

Furthermore, the appellant Weinblatt in his brief fails to quote the correct rule, as stated in Ryder v. State, the Georgia case, 100 Ga. 528, 28 S.E. 246, 38 L.R.A. 721, 748, 62 Am.St.Rep. 334, to which the annotations relied upon are appended:

"There seems to have been no violation of this well-settled rule in regard to the non-expert witnesses in this case. Each witness examined was allowed to state his opinion, and no one did so without giving his reasons therefor. The opinion and the reasons go to the jury together, that the jury may determine what the opinion is worth. It may be that a particular reason given for an opinion is not really a good one, and such a reason would most probably, in the mind of an intelligent juror, destroy the opinion at once; but, nevertheless, the opinion and the reason ought to be considered, that the jury may give the opinion such weight as they think proper."

In the instant case, the offer of proof made by Weinblatt's counsel did not include the facts upon which Weinblatt's opinion was based, but was couched in the most general language; namely, that Wilkes did not "appear" to the witness "as mentally competent," and that he was "generally" loose in his talk.

In Queenan v. Oklahoma, 190 U.S. 548, 549, 23 S.Ct. 762, 763, 47 L.Ed. 1175, in which the defendant's sanity was in issue, Mr. Justice Holmes said:

"Therefore, in this as in many other instances, after stating such particulars as he can remember,—generally, only the more striking facts,—an ordinary witness is permitted to sum up the total remembered and unremembered impressions of the senses by stating the opinion which they produced."

Furthermore, the question of whether or not the lay witness has sufficient data upon which to base a conclusion as to sanity is one primarily within the sound discretion of the trial judge. Except for cogent and compelling reasons, this discretion will not be reviewed.

In Turner v. American Security & Trust Co., 213 U.S. 257, 260, 261, 29 S.Ct. 420, 421, 53 L. Ed. 788, the court thus expounded the rule:

"Where the issue is whether a person is of sound or unsound mind, a lay witness who has had an adequate opportunity to observe the speech and other conduct of that person may, in addition to relating the significant instances of speech and conduct, testify to the opinion on the mental capacity formed at the time from such observation. [Cases cited.] * * *

"The order of the evidence must be left to the discretion of the trial judge; but, when sufficient appears to convince the trial judge that the witness has had an opportunity for adequate observation of the person's mental capacity, and has actually observed it, then the judge may permit him to testify to his opinion. * * *

"We are asked to review that discretion, and to say that, in the case of the eleven witnesses before us, it was improperly exercised. We have no hesitation in declining to do this. No general rule can well be framed which will govern all cases, and an attempt to do that would multiply exceptions and new trials. The responsibility for the exercise of the judicial power of determining whether a given witness has the qualifications which will permit him, to the profit of the jury, to state his opinion upon an issue of this kind, may best be left with the judge presiding at the trial, who has a comprehensive view of the issue and of all of the evidence, and the witness himself before his face.

"This is not to say that, in a very clear case, an appellate court ought not to review the discretion of the trial judge."

In the case before us, the failure of counsel to offer specific facts upon which Weinblatt's opinion of Wilkes' mental capacity was to be based, and Weinblatt's own statement that he "had been out of contact with Tom Wilkes for several years before his accident," indicate that the discretion of the lower court was properly exercised. Weinblatt was undertaking to compare Wilkes' mentality before and after the accident, while admitting at the same time that he had been out of contact with Wilkes for years before the accident. Furthermore, Weinblatt did not state the frequency of his contact with Wilkes after the accident. We cannot say that this is "a very clear case" in which we should "review the discretion of the trial judge." See, also, Taylor v. United States (C.C.A.5) 71 F.(2d) 76, 77.

There are twenty-five assignments of error. Each of these assignments is listed as a "specification" in the appellants' main brief, and it is asserted that each is relied upon as pointing out prejudicial error. We have here discussed, however, only those assignments that are argued in the briefs. As to the others, we might well have felt at liberty to disregard the points thereby raised. See Forno v. Coyle (C.C.A.9) 75 F.(2d) 692, 695, and cases there cited. Nevertheless, we have examined all the other assignments, and have found them to be without merit.

Accordingly, the judgment of the lower court is affirmed, as to each appellant.

Judgment affirmed.