[Civ. No. 18375.   Second Dist., Div. One.   Dec. 27, 1951.]

JOHN G. FRAZIER, Respondent, v. STANLEY A. MOFFATT, Appellant.

Morris Lavine for Appellant.

Harry R. Simon for Respondent.

WHITE, P. J.—This is an appeal by defendant from a judgment for $3,150 compensatory damages and $1,000 punitive damages in an action for false arrest and false imprisonment. The cause was tried before the court without a jury.

Consideration of the ground for reversal urged upon this appeal requires that attention be given to the evidence adduced at the trial. In that regard the record reflects that during the noon hour of May 16, 1949, at approximately 1 o'clock, defendant went to a café in Huntington Park, County of Los Angeles, as did plaintiff. In addition to the plaintiff there were present in the café Pearl Jacobsen, Fay Hudgins, Charles Bell, and a Mrs. Burt.

It is conceded that the defendant at all times here pertinent, was the duly elected, qualified and acting Justice of the Peace of San Antonio Township in Los Angeles County, and that the above-mentioned café was located within said township.

As to what occurred in the café, the evidence is in rather sharp conflict. However, to us, the following appears to be a fair epitome thereof.

The plaintiff testified, ''Well, we were in there and we were just laughing and having a real good time, and somebody got up and said, 'Shut your mouths.' We shut up and Mr. Moffatt came around and said to me, 'I guess you don't know who I am.' I said no. He said, 'I am Judge Moffatt.' I said, 'That

don't spell anything to me,' and he said, 'It will when I call the law because I am going to have you arrested,' and then he called the law.''

Fay Hudgins, a witness for plaintiff, testified, ''We were talking and laughing a little and then Pop (Frazier, the plaintiff) tickled Mrs. Burt under the chin and we all laughed a little bit louder, so when we were all laughing Judge Moffatt raised up in the booth and he said, 'Shut up, I am Judge Moffatt and I want it quiet in here,' . . .''.

Another witness for plaintiff, Pearl Jacobsen, testified that there was, ''quite a lot of conversation going on''; that except for Judge Moffatt, all were laughing, that plaintiff ''laughed, just a hearty laugh''; that when defendant was ''pretty near through with his lunch and we were all sitting there talking and laughing, he got up and he said, 'Shut up, you are making a lot of noise,' he said to John (plaintiff).''

Charles Bell, a witness for plaintiff, testified that ''Right after John (plaintiff) got down off his stool and walked over to Mrs. Burt and tickled her under the chin and laughed with her and everybody started laughing, I heard Judge Moffatt jump up and holler, 'Shut up, you disturb my lunch.' '' That defendant Judge Moffatt said to plaintiff, ''Well, you are disturbing my peace and I am going to have you arrested.''

Hamilton E. Robinson, another witness for plaintiff, testified that he had formerly employed the latter who, on occasions, ''was given to making loud noises,'' that ''He could laugh out loud you bet''; that plaintiff's laughter ''is usually a loud laughter but not extreme.''

Defendant Judge Moffatt testified that while eating his lunch his attention was attracted to plaintiff when the latter ''let out a war whoop or a yell like a coyote or jackass or something like that, that almost split my eardrums.'' That he (Judge Moffatt) did nothing at that time but, ''looked at him (plaintiff) to see whether he was crazy or drunk or something of that kind, and then he began a lot of very loud guffaw laughter''; that ''the next thing that I heard or the next thing that happened was, as far as I am conscious, I heard another one of these horrible war whoops or screams, I don't know what you would call it,—I never heard a noise like that in my life before, it was terribly loud, it was right at my left, about 12 feet away, and I involuntarily jumped out of the booth, just from the force of the impact of the scream . . . I jumped up and turned toward him in this aisle going down in the direction of F-2, as marked on this map, and when I got half

way down there, within probably seven or eight feet of him, I said, 'My God, man, what are you trying to do here?' "

Defendant then went to the telephone, called the police and upon their arrival directed them to arrest plaintiff for a violation of section 415 of the Penal Code (disturbing the peace), saying to the officers, "I want him arrested and I will file a complaint in your court."

In obedience to the order of defendant Judge Moffatt, the officers took plaintiff into custody and transported him to the city hall where he was imprisoned in jail for some two hours, when he was released on order of the chief of police of Huntington Park.

Following the filing of a complaint by defendant Judge Moffatt charging plaintiff as aforesaid, a trial was had resulting in the acquittal of plaintiff. Several businessmen and public officials, including the chief of police of Huntington Park and a deputy in the sheriff's department at said city, all testified they had known plaintiff for some considerable number of years and that his reputation in Huntington Park for "truth, honesty, integrity, and peacefulness was good."

With regard to damages, plaintiff testified he had never before been arrested, that his arrest was extensively publicized in newspapers. That the arrest and consequent publicity "affected me mentally and it affected me physically because I was not well at that time; I had just gotten over a heart attack and there were many times I had to go home and rest on account of things that would come up."

Plaintiff further testified that shortly after his arrest he suffered a recurrence of a heart condition and was compelled to consult a physician who ordered him to bed for more than a week.

It is first contended by appellant that the arrest and imprisonment of respondent were lawful and pursuant to statutory authority conferred upon a magistrate under section 838 of the Penal Code. That therefore, appellant magistrate was clothed with judicial immunity and cannot be held civilly responsible.

█ The section in question reads:

"*Magistrates may order arrest* (for offenses in presence). A magistrate may orally order a peace-officer or private person to arrest anyone committing or attempting to commit a public offense in the presence of such magistrate."

Section 807 of the Penal Code defines a magistrate as an officer empowered to issue a warrant for the arrest of a per-

son charged with a public offense, while section 808 of the same code, in effect at the times here pertinent, expressly provides that all the judicial officers of the state, beginning with the justices of the Supreme Court and on down to and including judges of city courts, are magistrates. Appellant, as a justice of the peace, was therefore a magistrate.

In their capacity as magistrates, the foregoing judicial officers are required under section 410 of the Penal Code to proceed to any place of unlawful or riotous assembly of which they have notice, and there exercise the authority with which they are invested for suppressing the same and arresting the offenders. For a failure so to do such magistrate is guilty of a misdemeanor.

The case now engaging our attention presents the question as to whether a magistrate is answerable civilly for damages allegedly resulting from an act done by him pursuant to the foregoing provisions of section 838 of the Penal Code, where, as claimed herein, such magistrate acts upon insufficient evidence and with a desire maliciously to injure the party whose arrest he orders an officer to make. The question is an interesting one, and so far as we are aware has not been decided— at least, not in any case cited to us or in any case we have unearthed in our own research.

A historical approach to the problem as one of the bases upon which to rest the decision, implemented by our own Constitution and the statutes dealing with the subject matter, reveals that in the early days of the common law the lord of the manor appointed in each county in England conservators of the peace who had the power and whose duty it was to personally arrest persons who were engaged in rioting or disturbing the peace. The jurisdiction of such conservators was confined to the county in which they lived. Not only did these conservators have the duty and power to arrest offenders engaged in rioting or disturbing the peace in their presence but they were vested with the additional power of deputizing bystanders to assist them. (Section 838 of the Penal Code of this state is of like import.) The conservators were in no sense judicial officers. In the reign of Edward I (1308), Parliament passed an act by which the duties and powers of the conservators were lodged in the hands of those who were designated as magistrates. The early magistrates in turn possessed no judicial functions. The office of magistrate, in turn, by act of Parliament became vested in a group known as justices of the peace. Initially the justices likewise possessed no

judicial power. It was not until the reign of George III that Parliament enlarged their functions, so as to invest them not only with the power to arrest and cause bystanders to assist them, but to enable them to try and convict the offenders. Their judicial duties or powers went no further. The civil jurisdiction exercised by justices of the peace, as we know it today is, relatively speaking, of a much more recent era.

When Parliament enlarged the powers of justices of the peace so as to grant to them the power to hear and convict offenders whom they had personally arrested or had caused bystanders to arrest upon their oral orders at the scene of the disturbances, the justices, nevertheless, were without judicial immunity for any of their acts as the courts of England had ruled that judicial immunity extended only to judges of courts of record. It was not until the decision of Chief Justice Tindal in the case of *Baylis* v. *Strickland* (1840), 1 Man. & Gra. 591, 133 Eng.Rep. 469, that justices of the peace came under the cloak of judicial immunity for their judicial acts.

An unbroken line of authorities including many English cases as well as authorities in our own country from the beginning of our judicial history sustains the principle that judicial officers are not liable for the erroneous exercise of *judicial* powers vested in them.

Equally unanimous is the reasoning contained in these cases that this immunity from liability is based upon considerations of public policy. That to hold judicial officers personally liable for errors of judgment concerning either questions of law or fact would be subversive of both independence and efficiency in the administration of justice.

The leading case in this country is *Bradley* v. *Fisher*, 13 Wall (80 U.S.) 335 [20 L.Ed. 646]. Practically all subsequent cases rely upon the opinion rendered in the case just cited when dealing with the immunity of judges from actions for damages growing out of their performance of their judicial duties. (See *Yaselli* v. *Goff*, 12 F.2d 396, 400 [56 A.L.R. 1239, 1245], affirmed by the Supreme Court of the United States, 275 U.S. 503 [48 S.Ct. 155, 72 L.Ed. 395] ; *Landseidel* v. *Culeman*, 47 N.D. 275 [181 N.W. 593, 595, 13 A.L.R. 1339] ; *United States* v. *Chaplin*, 54 F.Supp. 926, 928 et seq.)

In the case of *Yaselli* v. *Goff, supra,* page 401 [12 F.2d], the court said: ''It is essential in all courts that the judges who are appointed to administer the law should be permitted to administer it under the protection of the law, independently and freely, without favor and without fear. This provision

of the law is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences. How could a judge so exercise his office, if he were in daily and hourly fear of an action being brought against him, and of having the question submitted to a jury whether a matter on which he had commented judicially was or was not revelant to the case before him?''

The doctrine that an action will not lie against a judge for wrongful commitment, or for an erroneous judgment, or for any other act, made or done by him in his judicial capacity is upheld in *Platz* v. *Marion,* 35 Cal.App. 241, 248 [169 P. 697], wherein the court said with regard to the principle of judicial immunity: ''That it exists in this state in its fullest extent has been repeatedly declared by our own courts.'' (See, also, *Turpen* v. *Booth,* 56 Cal. 65, 67, 68, 69 [38 Am.Rep. 48].)

The cases clearly hold that where a judicial officer violates a criminal statute, he is held to the same responsibility as any citizen (*Craig* v. *United States,* 9 Cir., 81 F.2d 816; *United States* v. *Manton,* 2 Cir., 107 F.2d 834.)

Under our system of government judicial officers are responsible to the people, or the authorities constituted by the people, for the manner in which they discharge the great trust of their office. If, in the exercise of the powers with which they are clothed as ministers of justice, they act with partiality, or maliciously, corruptly, arbitrarily, or oppressively, they may be called to account and trial for misdemeanor in office or for wilful or corrupt conduct in office (Cal. Const., art. IV, § 18; Gov. Code, §§ 3020, 3060; *People* v. *Ward,* 85 Cal. 585 [24 P. 785]; *Baird* v. *Justice's Court,* 11 Cal.App. 439 [105 P. 259]). Also, judicial officers are subject to recall and must submit their judicial records to the people at regular elections when they seek to continue in office.

The instant case itself presents an example of the efficacy of this principle, because it is conceded that at an election occurring subsequent to the occasion here in question appellant was defeated for reelection.

We come now to a consideration of whether on the occasion here in question, appellant magistrate, when proceeding under the provisions of section 838 of the Penal Code, was acting

within his jurisdiction and performing a judicial act. From what we have hereinbefore said, it is manifest that if he was so acting he is not amenable to any civil action for damages.

It is said generally in the textbooks and decisions that the judicial officer, in order to entitle himself to claim the immunity that belongs to judicial conduct, must restrict his actions within the bounds of his jurisdiction. Jurisdiction has been defined to be ''The authority of the law to act officially in the particular matter in hand'' (Cooley on Torts, 417).

■ From a review of the cases we are persuaded that the test of immunity from a civil suit for damages on the part of a judicial officer is not whether he committed an error of judgment in acting as he did, but the question of judicial immunity must be determined on the basis of whether the act in question was within the general scope of the officer's judicial powers and whether he acted in an honest belief that he was legally warranted in doing it.

Since, as heretofore pointed out, it is elementary that judicial officers are not liable for the erroneous exercise of the *judicial* powers vested in them, we accordingly now pass to a consideration of whether the act here involved was or was not a judicial act.

In the consideration of that question we are at once confronted with article III of our state Constitution which reads:

''The powers of the government of the State of California shall be divided into three separate departments—the legislative, executive, and judicial; and no person charged with the exercise of powers properly belonging to one of those departments shall exercise any functions appertaining to either of the others, except as in this Constitution expressly directed or permitted.''

No provision is to be found in the Constitution expressly directing or permitting a magistrate to exercise any functions appertaining to the other departments of the government.

■ In consonance with the spirit and intent of the foregoing constitutional provision, the courts of this state have uniformly held that the Legislature is without power to confer upon courts jurisdiction that is not given or authorized to be given them by the Constitution, and that the Legislature can impose no duties on the judiciary but such as are of a judicial character (*People* v. *Sanderson,* 30 Cal. 160, 166; *People* v. *McKamy,* 168 Cal. 531, 532 [143 P. 752] ; *Burgoyne* v. *Board of Supervisors,* 5 Cal. 9; *Wulzen* v. *Board of Super-*

*visors,* 101 Cal. 15 [35 P. 353, 40 Am.St.Rep. 17]; *Phelan* v. *San Francisco,* 20 Cal. 39; *Epperson* v. *Jordan,* 12 Cal. 2d 61 [82 P.2d 445].)

No claim is made in the instant case that the delegation of power by the Legislature to magistrates through the medium of section 838 of the Penal Code is unconstitutional as not being judicial in character. Not only for that reason, but because of our own research we are prompted to hold that the delegation of power imposed upon the judiciary by the Legislature as aforesaid is the imposition of a duty with a corresponding power that is to be classed as a judicial act. This we say because in the light of the historical concept of the powers and duties of a magistrate, the authority conferred by section 838 of the Penal Code is manifestly a power to exercise functions incidental to the judicial position of a magistrate. Such a power is no more objectionable than the power to appoint an arbitrator or referee (*Tuolumne County* v. *Stanislaus County,* 6 Cal. 440, 442). If a power or duty imposed by the Legislature upon the judiciary partakes of a judicial or quasi judicial character it is not subject to constitutional infirmity. For instance, it has been held that the power of appointment of probation officers vested in the superior court in the exercise of its jurisdiction as a juvenile court is not unconstitutional as vesting an executive function in judicial officers (*Nicholl* v. *Koster,* 157 Cal. 416, 423 [108 P. 302]). That the power to make an arrest is not *per se,* abstractly speaking, an exclusive function of the executive department of the government is made manifest by the provisions of section 837 of the Penal Code which authorizes arrests by private persons.

From the foregoing it follows that when a magistrate acts pursuant to the provisions of section 838 of the Penal Code he is acting within his jurisdiction and in the performance of a judicial act, done in the execution of his office and within the purview of his general authority. When so acting a magistrate is therefore not amenable to any civil action for damages.

If immunity from civil actions for damages for judicial conduct under the provisions of section 838 of the Penal Code is to be abolished, such abolition must come from the Legislature through amendment or repeal of the applicable Penal Code sections under which it exists.

The foregoing conclusion at which we have arrived renders

it unnecessary to consider or decide other issues presented on this appeal.

The judgment is reversed and the cause remanded, with directions to the court below to enter judgment for the defendant.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied January 22, 1952, and respondent's petition for a hearing by the Supreme Court was denied February 21, 1952. Carter, J., was of the opinion that the petition should be granted.