**UNITED STATES v. PENDERGAST et al.***

**No. 5040 (Eq. Nos. 270–426).**

District Court, W. D. Missouri, Central Division.

May 28, 1941.

* It should be noted that while this proceeding in contempt was given by the clerk a separate number, No. 5040, it always was a proceeding purely incidental, and was so regarded by the court and all the parties, to the insurance litigation referred to in the findings of fact herein and in this opinion. It should be noted also that while the cases involved in the insurance litigation were filed in the Central Division of the Western District, all of the proceedings, by the consent of all the parties thereto, and all of the proceedings in connection with the trial of the proceeding in contempt, with the consent of all the parties, were had in Kansas City, in the Western Division of the Western District, where the judges were more easily assembled.

See, also, 34 F.Supp. 269.

Richard K. Phelps and Charles F. Lamkin, Jr., Asst. U. S. Attys., both of Kansas City, Mo., for plaintiff.

R. R. Brewster and John G. Madden, both of Kansas City, Mo., for T. J. Pendergast.

Terence M. O'Brien and Ralph M. Russell, both of Kansas City, Mo., for R. E. O'Malley.

Forest W. Hanna, of Kansas City, Mo., for A. L. McCormack.

Before STONE, Circuit Judge, and REEVES and OTIS, District Judges.

OTIS, District Judge.

This case concerns contempt charged to have been committed against this three-judge court by Thomas J. Pendergast, Robert Emmett O'Malley and A. L. McCormack. The case of Nye and Mayers, Petitioners v. United States of America and Guthrie, 61 S.Ct. 810, 85 L.Ed. ——, was decided by the Supreme Court April 14, 1941, after the trial of this case had begun. The reliance of learned counsel for defendants here is chiefly on the decision in that case. This court, of course, accepts in its full extent what was decided by the Supreme Court. But if ingenious counsel have misinterpreted that decision, out of an understandable inclination to save their clients from punishment for what was the grossest misbehavior against the administration of justice in a federal court of which there is any record known to us, this court is not bound by their misinterpretation. We think the Supreme Court will spurn it as unthinkable. We think the Supreme Court will make it clear to all that, while—as was ruled in the Nye and Mayers case—it is not punishable contempt for an individual, at a point one hundred miles away from the seat of justice, to persuade a litigant to sign and mail a letter to a judge directing the dismissal of his case, it is punishable contempt for an agent of fire insurance companies and a political "Boss" (whose influence was bought by the payment to him of $440,000) and a bribed state official (to whom $62,500 was paid in bribery) and a fourth individual, the go-between of the principal conspirators, in open court, in the presence and face of the court, grossly to deceive and hoodwink the judges constituting the court, and by that deception fraudulently to obtain decrees (inter alia) disposing of an impounded fund of $10,-000,000, so prostituting the court to their venal purposes and exposing its judges to the possibility of disgrace and to certain humiliation. What is presented in this case is as distinguishable from the facts in the Nye and Mayers case as night is from day.

Findings of Fact.

We state at once the essential facts (they are stated here as formal findings of fact) :[1]

1. On May 28, 1930, one hundred and thirty-nine insurance companies filed one hundred and thirty-seven separate injunction suits against the Superintendent of Insurance and the Attorney General of Missouri to protect proposed increase of premium rates for fire, windstorm and hail insurance filed by the companies with the superintendent. Thereupon this three-judge court was constituted. Temporary injunctions thereafter were entered upon conditions, one of which was that the companies might collect the increased rates pendente lite but must deposit the amount of the increase so collected with a custodian

---

[1] The full history of the fraud which was perpetrated on the court and of its effect upon the insurance litigation is set out in the opinion of this court filed August 14, 1940, and in the supplemental opinion filed April 12, 1941. Those opinions have been published and may be read in American Ins. Co. v. Lucas, 38 F. Supp. 896, 926.

of the court to await the ultimate outcome of the suits. Deposits were made aggregating $10,000,000.

2. One Charles R. Street, now deceased, was the agent of the companies. Thomas J. Pendergast was a political "Boss" with almost dictatorial power residing in Kansas City. R. Emmett O'Malley, a creature of Pendergast, was Superintendent of Insurance and a party-defendant in the suits. A. L. McCormack was an insurance agent residing in St. Louis.

3. Before final determination of any of the suits Street, Pendergast, O'Malley and McCormack conspired and agreed together that the insurance companies (acting through Street) and O'Malley would enter into a pretended or fake settlement of the suits, whereby the interest of policyholders would be sacrificed and 80% of the impounded fund would be paid to the companies. It was a part of the conspiracy—and it was effected by Street, Pendergast, O'Malley and McCormack—that Street, as agent of the companies, would pay Pendergast for his influence with and control over O'Malley the total sum of $750,000 ($440,000 actually was paid to Pendergast), with a portion of which O'Malley should be bribed to betray the policyholders ($62,500 was paid O'Malley) and with another portion of which McCormack was to be compensated for his services as messenger between Street, Pendergast and O'Malley (McCormack was paid $62,500). It was a part of the conspiracy—and it was effected by Street, Pendergast, O'Malley and McCormack—that when the fake settlement of the suits finally was agreed on by Superintendent O'Malley and Street, (the fake settlement was reached in the Muehlebach Hotel in Kansas City, about six blocks from the United States Court House where the suits were pending) the attorneys for the Superintendent and the companies (the attorneys being ignorant of the corruption and fraud) would present to the court, in open court, as a basis for motions for decrees, the fake settlement, as a genuine, good-faith settlement by antagonistic litigants. The fake settlement was presented to the court June 22, 1935, by Street, Pendergast, O'Malley and McCormack through and by their messengers. The court, the members of which were grossly deceived by the lying, false and fraudulent representation made in open court at the instance of Pendergast, O'Malley, Street and McCormack, entered the decrees February 1, 1936. The deception practiced on the court was vicious misbehavior, committed and consummated in the presence of the court and in open court. It was intended and calculated to mislead and deceive the court and to obtain fraudulent judgments and decrees. The deception was a continuing deception, was intended to exert its deceiving, pernicious and poisonous influence indefinitely, and until and unless discovered by the court. The deception was fortified and renewed by affirmative supplemental acts of deception committed as late as March, 1939.

4. When the court discovered (early in 1939)—through investigations of government agents into suspected income tax evasions and consequent grand jury inquisitions (the matter also was formally called to the court's attention by motions filed May 29, 1939)—that it had been victimized and its decrees obtained by gross imposture and fraud perpetrated upon it in open court and in the presence of the court, it requested the United States Attorney to file an information in contempt. The information in this case, filed at last on July 13, 1940, resulted.

### The Nye and Mayers Case.

1. There never has been the slightest word of denial by the testimony of any person or even by the assertion of counsel in argument that the defendants were not guilty of the misbehavior revealed in the findings of fact. Except for McCormack, who confessed, the defendants did not take the stand. They stood on their technicalities. Two of the defendants, Pendergast and O'Malley, entered pleas of guilty in this District Court (Pendergast on May 22, 1939, O'Malley on May 27, 1939), before one of its judges, to attempts to evade the payment of income taxes on receipts of the very money the insurance companies paid them for their services in deceiving and misleading the court and they had been sentenced to and had served sentences in the penitentiary for attempted evasion of taxes.[2] *That they got the money is a fact*

[2] The whole history of the criminal cases which resulted in the imposition of sentences on Pendergast and O'Malley for attempted evasions of income taxes, including much which throws light upon the background of the present proceeding in contempt, is set out in United States v. Pendergast and O'Malley, D.C., 28 F.

*that stands out like Pike's Peak! They were paid $440,000. For what?*

The misbehavior is confessed or had as well be confessed. As long as Toledo Newspaper Co. v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186; declared the law—as it did declare the law until April 14, 1941—misbehavior of the character of this obviously was punishable contempt. But counsel seem to argue that the Nye and Mayers case lays down an astounding doctrine—Misbehavior, to be punishable contempt, even if committed in the presence of the court, must be of that character of misbehavior which disturbs the peace of the courtroom.

The Supreme Court espouses in the opinion of April 14, 1941, no such emasculating and destructive doctrine as counsel in this case would thrust upon it. Quite the contrary. The case dealt only with the proper interpretation of the phrase "so near thereto" in the statute, Judicial Code, Sec. 268, 28 U.S.C.A. § 385, providing that the "power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice * * *." It did not involve the companion phrase—misbehavior "in the presence of" the court. The court expressly cited with approval, as illustrating misbehavior "in the presence of the court," punishable as contempt, Ex parte Savin, Petitioner, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150 and Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767. The misbehavior in the Savin case was an attempt to intimidate a witness in the jury room, used as a witness room, and an attempt to intimidate a witness in a hallway of the courthouse while court was in session in the courtroom. The judge and other officials knew nothing of the misbehavior until it was revealed at a time hours subsequent to its occurrence. Here, of course, was no disturbance of the peace, no uproar in the courtroom, no interference with order and decorum within any narrow meaning of those words. But the Supreme Court said unanimously it was punishable contempt committed "in the presence of the court." [131 U.S. 267, 9 S.Ct. 702, 33 L.Ed. 150.] In the Cooke case the misbehavior was sending a letter to the judge. The letter was written by Cooke blocks away from the courthouse and was delivered by a messenger to the judge in chambers, court being then in a short recess, and, therefore, "in the presence of the court" (267 U.S. loc. cit. 535, 45 S.Ct. loc. cit. 394, 69 L.Ed. 767), and contempt for that it was "calculated to stir the judge's resentment and anger." 267 U.S. loc. cit. 534, 45 S.Ct. loc. cit. 394, 69 L.Ed. 767. Unanimously the Supreme Court said "the letter was contemptuous." 267 U.S. loc. cit. 534, 45 S.Ct. loc. cit. 394, 69 L.Ed. 767. Mr. Justice Holmes, whose dissent in the Toledo case is pointed to and relied on in the Nye and Mayers case, concurred in the opinion in the Cooke case.

### "In the Presence of the Court".

It is perfectly clear then that the Supreme Court did not intend to say and did not say in the Nye and Mayers case that only misbehavior which disturbs the peace of the courtroom is punishable contempt. "I do not understand my brethren to maintain that the secret bribery or intimidation of a witness in the court room may not be summarily punished" [i. e., punished as contempt], said Justice Stone in his dissenting opinion in the Nye and Mayers case [61 S.Ct. 819, 85 L.Ed. ——], the Chief Justice and Mr. Justice Roberts concurring. Of course, the dissenting justices said that, in view of the approval by the majority of the Savin and Cooke cases.

What then is now the law of contempt as to misbehavior committed "in the presence of the court"? This much may be said with certainty—Any such misbehavior is punishable contempt, if it interferes with or tends to interfere with the administration of justice in some pending case.

Did the Nye and Mayers case change the interpretation of—"in the presence of the court," as that phrase was interpreted in the Savin and in the Cooke case, approved by the Nye and Mayers case? There can be no pretence that it did so. What is done in the witness room or in the corridors or in the chambers of the judge adjacent to the courtroom, while court is in session or during some short recess of court, is "in the presence of the court," whether what is done is or is not known to the presiding judge. The secret

Supp. 601. It is there made emphatically clear that Pendergast and O'Malley were sentenced only for the offenses charged against them and to which only they entered pleas of guilty, namely, attempted income tax evasions.

and whispered communication with the witness in the Savin case was misbehavior committed "in the presence of the court," although the judge knew nothing about it until a later time. The sending by messenger of a letter which is delivered to the judge in chambers during a recess, as in the Cooke case, is misbehavior "in the presence of the court" and punishable contempt. The Nye and Mayers case does not question these long-established declarations of law. The dissenting justices expressly said the majority of the court did not question them. Any careful study of the opinion supports the view that the majority does not question the meaning of "in the presence of the court" repeatedly declared in earlier decisions.

It is true that a superficial reading of the opinion in the Nye and Mayers case develops a little verbal support for the argument of counsel. The alleged contemnor in that case had persuaded a litigant, one Elmore, to sign a letter addressed to the judge. It was mailed. It was received by the judge. Where it was received, whether at the post office or in chambers or at his home or at some other town than that in which court was being held, or, if in chambers, whether during a recess while court was in session (facts treated as essential in the Cooke case), none of these facts is stated either in the opinion of the Supreme Court or in the opinion of the Court of Appeals.[3] In short, nothing in the case remotely suggests that any act of alleged contemnors either was committed or consummated "in the presence of the court." The court said—"So far as the crime of contempt is concerned, the fact that the judge received Elmore's letter is inconsequential." How superficial to conclude that the Supreme Court meant to say that if an alleged contemnor's contemptuous letter, signed and mailed by the contemnor, is delivered to the judge in chambers, while court is in session, that would not be punishable contempt. The Supreme Court said nothing of the kind and could not have said anything of the kind after just having approved what was said in the Cooke case. It cannot be argued that the Supreme Court meant to say that if Nye himself had written a letter of such a character as that to write it constitutes misbehavior, and himself had signed and mailed that letter to the judge of the court in which a case was pending, and if the letter so signed and mailed had been delivered to the judge in chambers and received by him while court was in session, that then there would not have been contempt committed "in the presence of the court."

The misbehavior of the defendants in this case was committed in the very presence of the court and in open court. These defendants sent their messengers (their innocent and unsuspecting messengers) to the very courtroom and into open court (just as Cooke sent his messenger with his letter to the chambers of the court while court was in session). The misbehavior of these defendants was committed where it took effect and where it was intended to take effect. Except for what was contemplated should be done in open court, the misbehavior was without meaning or significance and would have been entirely futile. As was so well said by the Circuit Court of Appeals for the Ninth Circuit in Independent Publishing Co. v. United States, 240 F. 849, 856—"the misbehavior is committed where it takes effect." In its opinion the Court of Appeals quoted the observation of the Supreme Court of Georgia in Simpson v. State, 92 Ga. 41, 17 S.E. 984, 22 L.R.A. 248, 44 Am.St.Rep. 75: "The well-established theory of the law is that, where one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual. * * * So, if a man in the state of South Carolina criminally fires a ball into the state of Georgia, the law regards him as accompanying the ball, and as being represented by it up to the point where it strikes."

### The Test of Probable Effect.

A repeatedly approved method of construing the meaning of an instrument, a statute, or a judicial opinion is to examine the possible and probable effects thereof. If the Nye and Mayers case means what counsel for defendants contend, then the only way to punish any of these par-

---

[3] We have also examined the record in the Nye and Mayers case which the clerk of the Supreme Court was kind enough to send us. Not only does that record not disclose that the letter to the judge was delivered to him in chambers while court was in session, but it is a very reasonable inference from the facts disclosed that it was not delivered to him in chambers while court was in session.

ties for the outrageous imposition upon this court is by indictment and ensuing criminal prosecution. This is so because they contend that all contempts, other than breaches of decorum during court sessions, are included in that decision.

Breaches of decorum in a courtroom are, nearly always, trivial matters which can be easily controlled and can have little influence upon public respect for courts and even less upon the reaching of just results in courts. They affect only the order in the courtroom. The contemptuous acts which break down public confidence in courts are those which improperly influence the fairness of trials and the justice of trial results. We cannot believe that the Supreme Court intended to hold that Congress has left to the courts power to protect themselves against trivial disturbances and has taken from them all power to protect themselves against acts which strike at the very heart of the administration of justice by the courts.

What might be the effect upon respect for the courts and the administration of justice in them if this contention be sound? We do not have to go beyond matters connected with this litigation for the answer. First, there must be an indictment procured. Next there must be a criminal prosecution carried through to conviction. Most of this procedure is entirely beyond any control of the court which may have been grossly victimized by being innocently used as an instrument to effectuate injustice. What can happen? What has happened here?

As set forth hereinafter in more detail (under the heading "No Double Jeopardy"), Pendergast and O'Malley were indicted for failure to return, for income tax purposes, the very bribe money involved here. To procure pleas of guilty therein, the United States Attorney, as it now appears, agreed not to prosecute either of them for any other offenses connected with such transactions. One of the judges of this court caused to be presented to a subsequent grand jury this bribery transaction with the result of an indictment for obstruction of the administration of justice. That obstruction of justice was the procurement of the decrees of February 1, 1936, in these rate litigations, by this bribery. After impanelment of a petit jury in those prosecutions, the United States Attorney entered in each case a

nolle prosequi. This he did in performance of the above agreement. Had this present contempt proceeding been by indictments, can it be doubted that the same ending would have resulted therein?

Thus we have the picture following. By gross bribery of a public official (Superintendent of Insurance O'Malley), representing several millions of policyholders and involving about $10,000,000, a court is innocently induced to enter decrees disposing of such rights. The bribed are indicted for not returning the received bribe for income tax purposes. To procure pleas of guilty therein, the United States Attorney agrees not to prosecute them for the bribery transactions. If this indubitable contempt of this court can be reached only by indictment, it would not be prosecuted. In short, those who perpetrated a gross fraud against the administration of justice go scot free and the court which has been victimized is powerless.

What respect can the public have for a system which permits such results? Yet just such results would occur here and would be unpreventable by this court, if defendants have construed the Nye and Mayers case correctly. Surely the Supreme Court did not mean to declare, in the Nye and Mayers case, that Congress intended to create such a possible situation by its enactment of Section 268 of the Judicial Code, 28 U.S.C.A., § 385.

### Minor Points Considered.

2. In addition to their argument that the Supreme Court by its decision in the Nye and Mayers decision has made the federal trial courts impotent to deal with the grossest sort of misbehavior, even if committed "in the presence of the court," unless it is a specific kind of misbehavior, namely, a disturbance of the courtroom peace, counsel advanced four other arguments. Counsel said they were not abandoning still other points, but these points they pressed: (1) A three-judge court has no jurisdiction under any circumstances to punish for contempt incident to a case pending before it; (2) The guilt of defendants was not proved beyond a reasonable doubt; (3) Defendants are saved by the statute of limitations; (4) Theoretically the defendants have been placed in double jeopardy by this proceeding. Concerning certain of these arguments already

we have expressed our views. United States v. Pendergast et al., D.C., 35 F. Supp. 593. We wish now only to supplement what we said in the opinion cited.

We shall not further discuss in this opinion the contention that a three-judge court cannot deal with contempt incident to a case pending before it. If a three-judge court is the only eunuch among courts, if it alone cannot maintain its dignity and its authority, let the declaration of its weakness and incompetence be made elsewhere than here.

3. We shall not discuss at length the asserted failure to prove guilt beyond reasonable doubt. If the facts we have found do not prove guilt, guilt never can be proved in any case.

Even zealous counsel (and counsel for defendants are zealous, able and honorable) never, at any time, have asserted—we think they never will assert—that our finding that defendants were paid by the agent of the insurance companies $440,000 in connection with decrees to be secured in this court is not the truth. *That the defendants got the money is a fact that stands out like Pike's Peak. They were paid $440,000. For what?*

When counsel speak of facts not proved beyond a reasonable doubt evidently they refer to deductions the court has drawn from facts proved. Street gave Mc-Cormack, at different times, $440,000. Mc-Cormack carried the money which Street had given him to Pendergast. Pendergast gave O'Malley, out of the money received from Street through McCormack, $62,-500, and gave McCormack $62,500. The whole transaction was for the express purpose of effecting a settlement of the insurance litigation which would give the companies 80% of the impounded fund. The court has deduced from these and other proved facts that there was a conspiracy between Street, Pendergast, O'Malley and McCormack to obtain decrees disposing of the impounded fund in accordance with the scheme of the conspirators. The court has deduced from the proved facts that Street, Pendergast, O'Malley and McCormack intended to and did execute the scheme, in the only way it could be executed, by procuring, in open court, in the presence of the court, through attorneys, ignorant of the background of the scheme and its corrupt and fraudulent character, the decrees which were the whole object of the scheme. But

these deductions are as completely and fully proved by the facts as the deduction that when X points a gun toward Y and fires and Y falls with a bullet hole in his forehead, Y has been shot by X, although no one testifies that he has seen the bullet on its way from the muzzle of the gun to the forehead of the murdered man. Judges too may draw necessary and obvious inferences even as jurors may draw inferences.

### Matter of Limitations.

4. In our opinion in 35 F.Supp. we discussed fully the statute of limitations argument still urged upon us. We incorporate here by reference that opinion and briefly supplement what was there said. The whole theory of counsel is that the misbehavior of defendants ended when they caused false representations to be made to the court on June 22, 1935. That theory is unsound. So far as the court is concerned, that date was when the misbehavior of defendants commenced. The essence of the misbehavior was the deception practiced on the court. If the truth had been revealed the next day after the false representations were made, of what value would the deception have been to the conspirators? It was intended that the deception planted on June 22, 1935, should exert its effect continually thereafter. So long as the deception continued to deceive —and it did that until early in 1939—the misbehavior continued. The misbehavior here was the planting of a lie in the minds of the judges and in the records of the court, a lie whose emanations—like the baleful emanations of radium—would continue and were intended to continue to deaden the sensibilities of the victims imposed on for an indefinite period. If a criminal plants a bomb in his victim's residence which will explode in a month, when does the statute of limitations begin to run,—when he plants the bomb, or when it does its devastating work? If a criminal plants in another's house some receptacle of noxious gas which slowly will exude its poison during months, when has his crime been completed, if six months afterward the gas exuding destroys a human life? Is not the crime completed then? The statute of limitations begins to run then.

Moreover, we have found the fact to be that defendants fortified and renewed their original and continuing deception by affirmative supplemental acts of deception

committed as late as March, 1939. The particular acts of supplemental deception indicated by the evidence were (a) the solicitation by O'Malley of McCormack, that in McCormack's testimony to the grand jury he should not reveal O'Malley's connection with the matter of obtaining the fraudulent decrees and (b) McCormack's first testimony to the grand jury, in which he concealed by perjury his own, as well as Pendergast's and O'Malley's connection, with the deception of the court. We say that these were affirmative and supplemental acts of deception, fortifying and keeping alive the original continuing deception. The deception conceived by the conspirators in its very nature involved the necessity that each of the parties should prevent discovery of the truth by any and every active means, should discovery of the truth ever seem to be impending. That was proved when the scheme to deceive was proved. When, therefore, O'Malley, learning that McCormack had been called to testify before the grand jury, took affirmative steps to stop McCormack's mouth, and when McCormack, being actually called to testify before the grand jury, concealed by perjury his and Pendergast's and O'Malley's connection with the fraudulent decrees, both O'Malley and McCormack, by affirmative acts, were carrying out the plan of all. The contention now made by counsel that because McCormack testified there was no express agreement to this effect means nothing. There was no formal agreement, of course. It is elementary that a formal agreement need not be proved, when what was done reasonably may be inferred as having been agreed upon by the parties.

There is another thought which in this connection should not be overlooked. In one theory, sometimes hinted at in the decisions, the very essence of misbehavior "in the presence of the court" which makes it contempt of court is the effect of the misbehavior upon the mental balance of the judges who must decide cases pending. So in the Cooke case the Supreme Court said that the misbehavior there was contempt for that it was "calculated to stir the judge's resentment and anger." Now the lie which was planted in the court by the defendants here could not produce its effect of stirring the resentment and anger of the court until it was discovered by the court that it was a lie. And that did not happen in this case until the spring of 1939.

While we think, therefore, that there is no statute of limitations applicable to contempt committed "in the presence of the court," we think also that if there is, it did not begin to run in this case until the deception practiced by the defendants ceased to have effect nor until the last affirmative act fortifying the deception was committed by the conspirators, or one of them, nor until the essence of the contempt became an active principle by the discovery of the truth.

### No Double Jeopardy.

■ 5. The double-jeopardy argument remains to be considered but it can be disposed of in a short paragraph. The basis of the argument is this. In addition to the information charging contempt of court, which initiated the present proceeding, the grand jury also returned an indictment against defendants charging an attempt to obstruct the administration of justice. The indictment was bottomed upon some, but not all, of the facts charged in the information in contempt. When the criminal case was ready for trial and a jury had been impanelled, the United States Attorney, then in Washington, wired the Assistant United States Attorney in charge of the prosecution to enter a nolle prosequi. This action was taken after the jury had been impanelled. The case was dismissed when the entry of nolle prosequi was made.[4]

---

4 The legal question presented is not affected by the background of the dismissal of the criminal case upon the entry of nolle prosequi. For the sake of the record, however, we desire to present the essential parts of that background in this footnote. The telegram of the United States Attorney is in the record. In the telegram he gave the reason for his action in entering a nolle prosequi of the criminal case. The reason given was that he had entered into an agreement with counsel for Pendergast and O'Malley, before they entered pleas of guilty to attempting to evade income taxes, that he would not prosecute them for other offenses, if they entered pleas. He believed that he should abide by that agreement, even as to an indictment returned during the term of another United States Attorney, and actively secured by that other United States Attorney.

This court never had heard of the existence of any such agreement until the telegram dismissing the criminal case was made public. None of the judges of this court ever had heard from the United States Attorney of the existence of any

There is not, however, the slightest suggestion that the dismissal was over the objection of the defendants, or any of them. It was not only not over their objection,

such agreement until the telegram was made public. We do not state these facts in criticism of the United States Attorney. Indeed, on several occasions, the two district judges of this court have attested their high regard for him and for his public services and they now reassert that high regard. His public services have been outstanding and deservedly have won for him the respect of the nation. We think he had the undoubted right to make the agreement—unless it included the bargaining away of this court's power to punish for contempt (and there has been no contention that the United States Attorney attempted that). In fairness to the United States Attorney, we desire to make it very clear that he never has said, so far as we are aware, that the agreement disclosed by his telegram was known to this court or to any of the judges of this court.

When Pendergast entered a plea to the charge of attempting to evade taxes, the United States Attorney stated in open court that he did not intend to prosecute him for certain other offenses he might have committed and he intimated that the court might take into consideration, in assessing punishment, other offenses. He said nothing about an agreement. Attorneys for Pendergast said nothing about an agreement and admitted none. There was on their part no confession or admission of any offense except that which was charged in the indictment. For that alone, said they, the defendant should be sentenced. There was not the slightest intimation by anyone that the plea of guilty was entered upon a condition that Pendergast would not be prosecuted for some other and graver crime. The court, in imposing sentence, immediately made it emphatically clear that Pendergast, pleading guilty to and confessing only the crime charged, could be sentenced only for the crime charged and confessed. When, a week later, O'Malley was sentenced for attempting to evade taxes, once more it was made emphatically clear from the bench that he was sentenced only for the offense charged and confessed. Both he and Pendergast, said the court, might thereafter be charged with other offenses, in which event they would be entitled to due process of law. There was still no intimation of an agreement inconsistent with the court's declaration. See, D.C., 28 F.Supp. 601.

The United States Attorney did not mention any agreement when he was requested by this three-judge court to institute contempt proceedings and to secure an indictment from the grand jury against any who had been guilty of obstruction of justice. On the contrary, he said he would undertake to comply with the request of the court. A year afterward, the Acting United States Attorney, who had been an Assistant United States Attorney at the time of the agreement, when he was requested by the court to institute a contempt proceeding and to secure an indictment, if possible, did not say (we are sure he did not know) that there was any agreement that would constitute an obstacle to the prosecution of an indictment, if secured, or an information, if filed. Once more, after an interval, again Assistant United States Attorney, the same fine lawyer, has conducted this prosecution with courage and ability, never suggesting any agreement as an obstacle. When the indictment was returned and when the information was filed, and when the United States Attorney who had made the agreement had been reappointed United States Attorney, he did not intimate that there was any agreement which would prevent the prosecution of the indictment and of the information in contempt. He could have dismissed the indictment at any time. But the indictment was not dismissed until after a judge had been brought to Kansas City from South Dakota to try the case and until after a jury had been impanelled at great expense for the trial. A reasonable inference is that he made known the agreement then, at the instance and request of counsel for defendants, who themselves had kept in strictest secrecy the existence of an agreement until after Pendergast and O'Malley had been sentenced and the term had passed and sentences could not be changed. Counsel not only did not object to the nolle prosequi but were happy to escape trial by jury. If it was a part of their strategy that thereafter they would seek to avoid punishment for contempt by asserting defendants had been put in jeopardy under the indictment, we are certain the United States Attorney was not taken into their confidence.

All that the United States Attorney did was altogether legitimate and actuated by good and honorable motives. We advert to the matter only that the record may clearly show that neither this court nor any of its members ever had knowledge of any agreement with the defendants or their counsel that conceivably might be urged as preventing prosecution for contempt of court.

but clearly it was sought most earnestly by the defendants, who had ·done everything conceivably possible to be done to avoid trial. The law is that when a case has been dismissed by nolle prosequi, the ·defendants not objecting to the dismissal, the defendants have not been put in jeopardy. Craig v. United States, 9 Cir., 81 F.2d 816, certiorari denied, 298 U.S. 690, 56 S.Ct. 959, 80 L.Ed. 1408, rehearing denied, 299 U.S. 620, 57 S.Ct. 6, 81 L.Ed. 457; Compare United States v. Shoemaker, 27 Fed.Cas. 1067, 1069, No. 16,279.

### Conclusion.

Upon the facts found to have been proved beyond a reasonable doubt and herein stated in our Findings of Fact we declare the· defendants and each of them guilty of contempt of this court as charged in the information. The formal judgment will be embodied in a separate document. Also there will be embodied in a separate document the rulings of the court on objections to matters of evidence in all instances where rulings were withheld at the trial. The time for imposing sentences will be announced hereafter and due notice thereof will be given to all concerned.

### Judgment.

This proceeding in contempt coming on to be heard upon (a) the information filed by the United States Attorney at the direction of this court sitting in cases Nos. 270 to 426, inclusive, (b) the rule to show cause, and (c) the answers of the defendants thereto; and the court having (a) judicially noticed the proceedings, files and records in cases Nos. 270 to 426, inclusive, for the limited purpose of ascertaining in this incidental proceeding the character of those cases and their status and condition on and prior to February 1, 1936, and (b) having heard the evidence offered by the parties in this incidental contempt proceeding and the argument of counsel, and (c) being fully advised in the premises, and (d) having filed herein its opinion, including its Findings of Fact and its conclusion touching the guilt of defendants, now, therefore,

It is ordered, adjudged and decreed that—

1. The defendants, Thomas J. Pendergast, Robert Emmett O'Malley and A. L. McCormack, are guilty of contempt of this court; and that

2. The defendant, Thomas J. Pendergast, be and he is hereby sentenced to the custody of the Attorney General of the United States for imprisonment in an institution of the penitentiary type for a period of two years; the defendant, Robert Emmett O'Malley, be and he is hereby sentenced to the custody of the Attorney General of the United States for imprisonment in an institution of the penitentiary type for a period of two years; the defendant, A. L. McCormack, be and he is hereby sentenced to be on probation for a period of two years; and that

3. To conform with the fact, the clerk of this court shall add to the word and figures "No. 5040," wherever they appear after the style of this incidental proceeding, the words—"a proceeding in contempt incidental to Equity Cases Nos. 270 to 426, inclusive;" and that

4. The costs of this incidental proceeding are assessed against the defendants Thomas J. Pendergast and Robert Emmett O'Malley.