**O'MALLEY v. UNITED STATES.**

**PENDERGAST v. SAME.**

**McCORMACK v. SAME.**

Nos. 12067 and 12116; 12075 and 12117;
12087 and 12118.

Circuit Court of Appeals, Eighth Circuit.
June 1, 1942.

678

See, also, D.C., 35 F.Supp. 593.

Ralph M. Russell and John G. Madden, both of Kansas City, Mo. (James P. Aylward, R. R. Brewster, James E. Burke, Brewster, Brewster & Brewster, and Madden, Freeman & Madden, all of Kansas City, Mo., on the brief), for appellants O'Malley and Pendergast.

William S. Hogsett and Richard K. Phelps, both of Kansas City, Mo., special counsel and as amici curiae, for appellee.

Before GARDNER, THOMAS, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

These are appeals from judgments convicting appellants, Robert Emmett O'Malley, Thomas J. Pendergast, and A. L. McCormack, of criminal contempt. A somewhat extended statement of the facts leading up to and involved in the conduct held to have been contemptuous will be necessary.

On May 28, 1930, 139 insurance companies filed 137 separate injunction suits against the Superintendent of Insurance and the Attorney General of Missouri, to protect proposed increase in premium rates for fire, windstorm, and hail insurance filed by the companies with the superintendent. Motions for interlocutory injunctions were brought on for hearing before a three-judge court and interlocutory injunctions were entered upon conditions, among others, that the companies might collect the increased rates pendente lite but must deposit the amount of the increase so collected with a custodian of the court to await the ultimate outcome of the suits. Deposits were made aggregating $10,000,000.

One Charles R. Street, now deceased, was the agent of the companies; Thomas J. Pendergast was a political boss with almost dictatorial power, residing in Kansas City, Missouri; Robert Emmett O'Malley, a creature of Pendergast, was Superintendent of Insurance and a party defendant in the suit; A. L. McCormack was an insurance agent, residing at St. Louis, Missouri.

While these suits were pending and undetermined, Street, Pendergast, O'Malley and McCormack, conspired and agreed together that the insurance companies, acting through Street and O'Malley, would enter into a pretended or fake settlement of the suits, whereby 80% of the impounded fund would be paid to the insurance companies; that Street, as agent of the insurance companies, would pay Pendergast for his influence with and control over O'Malley the sum of $750,000, with a portion of which O'Malley should be bribed to betray the policyholders, and with another portion of which McCormack was to be compensated for his services as a go-between. Pursuant to this conspiracy, the named conspirators, after some conferences, agreed upon a fake settlement at a conference in the Muehlebach Hotel in Kansas City. The attorneys for the superintendent and the companies, being ignorant of the corruption and fraud in the settlement, presented to the court in open court, as a basis for motions for decree, the fake settlement as a genuine, good-faith settlement by antagonistic litigants. This sham settlement was presented to the court on June 22, 1935, by Street, Pendergast, O'Malley and McCormack, through and by their emissaries. The court, the members of which were without knowledge of the fraudulent character of the proposed settlement, was grossly deceived by the false and fraudulent representations made in open court at the instance of the conspirators, including the appellants, and entered a decree pursuant to the said fraudulent settlement.

The court found that the deception practiced upon it was vicious misbehavior committed and consummated in its presence and in open court; that it was intended and calculated to mislead and deceive the court, and to obtain fraudulent judgments and decrees; that the deception was a continuing deception, was intended to exert its deceiving, pernicious and poisonous influence indefinitely and until and unless discovered by the court; that the deception was fortified and renewed by affirmative supplemental acts of deception committed as late as March, 1939.

At a conference in Kansas City, which followed a prior conference held in Chicago, a written agreement was executed by Street, as agent for the insurance companies, and O'Malley, as Superintendent of Insurance, which provided that O'Malley, as superintendent, would make an order approving 80% of the increase in rates sought by the insurance companies, and that the parties to the pending litigation, by their attorneys, would appear in court and join in seeking appropriate orders for

distribution of the impounded money, 20% to policyholders, 50% to the insurance companies, and 30% to Charles R. Street and Robert J. Folonie, as trustees for the insurance companies. These trustees were to account therefor to the companies, but not to the court nor to the Superintendent of Insurance. The agreement provided that the insurance companies would take appropriate means to present to the court the agreement of settlement; that O'Malley, as superintendent, would appropriately consent to decree for distribution of the impounded monies, and that the companies and O'Malley would mutually undertake to join in securing orders for decrees confirming their agreement. In the meantime, Pendergast had been paid some $400,-000 of the $750,000 agreed to be paid. The insurance companies accordingly filed in each case a motion reciting the terms of settlement and praying for an order of distribution in accordance therewith. Following the filing of these motions by the insurance companies, O'Malley and the insurance companies filed in each case their stipulation agreeing that the court should make such order of distribution.

On June 22, 1935, on October 26, 1935, and on January 24, 1936, hearings in open court were had, and motions and briefs were filed by counsel for O'Malley. The written agreement of May 18, entered into at the Muehlebach Hotel, was not produced nor shown to the court. At the hearings the court was urged to enter order or decree of distribution in accordance with the agreement. The court was assured of the good faith of the settlement; that it was a fair settlement for the policyholders; that the insurance companies had suffered more in the distribution than anyone else, and that O'Malley had worked faithfully and intelligently for the policyholders, whose specific representative or trustee he was. At the hearing in open court on October 26, 1935, counsel for O'Malley assured the court that the settlement "was a good settlement," "a tremendous and splendid settlement from the standpoint of the policyholders," that it was the "cleanest, most decent, and the finest settlement ever made in Missouri." Counsel informed the court that O'Malley had specifically requested that they "show this court the motives" which had inspired him to make this settlement; that he had driven "as hard a bargain as he could," and had made "a settlement which he thinks is clean, fine and decent."

The trial court found that counsel were ignorant of the bribery, corruption and fraud which lay back of the settlement. The court, relying upon the representations made, entered decrees of distribution in accordance with the motions and stipulations. The funds which had been impounded under the terms of the interlocutory injunctions were in the custody and control of the court, awaiting the ultimate determination of whether such funds belonged to the companies or to the policyholders.

Street died February 1, 1938. The Commissioner of Internal Revenue, upon investigation of Street's income tax returns, found that large sums had been received by him as a result of his activities in connection with Missouri fire insurance rate litigation, which he failed to report for the year 1936. In March, 1939, McCormack testified to the underlying facts before a federal grand jury, which was conducting an inquiry into the matter. Prior to that time, he had kept secret, as had also Street, Pendergast and O'Malley, the corrupt acts in connection with the settlement of the insurance suits. On May 29, 1939, after report of the fraud had created a public scandal, the then Superintendent of Insurance filed a motion in the insurance rate litigation, asking that the decrees of February 1, 1936, be set aside and the insurance companies be ordered to restore the previously impounded funds which had been distributed to them. The insurance companies made prompt repudiation of the settlement. An order of restitution was made and the insurance companies restored the money they had received.

At the conclusion of the hearing on May 29, 1939, Judge Stone asked the United States District Attorney whether contempt proceedings would be filed against any "individual or individuals who have engaged or been consciously connected with foisting an improper agreement upon this court, and inducing its action thereby." Following the taking of evidence as to this corrupt settlement, Judge Stone, on May 20, 1940, again called attention to the facts that had been before the court, and said: "It is apparent from the statement of counsel upon both sides here that there is, in the evidence in this regard, ground for believing that there has been a very gross imposition and fraud perpetrated in and upon this court by at least Pendergast, O'Malley and McCormack and there may be others." On behalf of the court he requested the

Acting United States Attorney to prepare such pleadings and citations as might be necessary to institute contempt proceedings against "the three persons named and any others which an examination of this evidence or any other knowledge which he may have or may obtain to warrant him in also including in either a combined or separate citation." Following this, an information was filed, charging the appellants with contempt in fraudulently concealing the corrupt settlement from the court and inducing it to act on the representations of fairness and honesty in the compromise presented to it. A rule to show cause was issued and the three defendants filed motions to abate and quash the information, which the court overruled. Its opinion on these motions is found reported as United States v. Pendergast et al., D.C., 35 F.Supp. 593. Appellants then filed pleas and answers. Following hearings, the three-judge court in the contempt proceeding adjudged the three appellants guilty of contempt of court, all of the judges concurring. United States v. Pendergast, D.C., 39 F.Supp. 189.

Reversal is sought on substantially the following grounds: (1) The acts charged or proved did not constitute contempt punishable upon information; (2) prosecution is barred by the statute of limitations and by laches; (3) prosecution under the information subjects appellants to double jeopardy, as they were prosecuted under indictments for the same offense and discharged after a jury was sworn; (4) the prosecution of the instant information is in violation of the agreement of appellants with the United States; (5) the court was disqualified because of prejudice and prejudgment; (6) the three judge court was without jurisdiction to entertain the original rate litigation, to issue an interlocutory injunction in those proceedings, or to entertain the proceeding for criminal contempt; (7) appellants were denied due process by the act of the court in taking judicial notice of the proceedings, files, and records in the insurance rate litigation, after close of the evidence. We shall consider these contentions in the order named.

1. The power inherent in every court to punish for contempt has been limited in Federal courts, other than the Supreme Court, by Act of Congress. Section 268 of the Judicial Code, Sec. 385, Title 28 U.S.C.A., provides that the courts of the United States shall have power to punish by fine or imprisonment, contempts of their authority, and, "Such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice," etc. Appellants do not here seriously question that the acts of misbehavior disclosed by this record constitute contempt of court, but they contend that a summary conviction based on information and rule to show cause, as distinguished from indictment and the right to jury trial, was not authorized in view of this statute. They insist that the misbehavior or obstructing acts were not committed in the actual presence of the court, or in such immediate geographical proximity thereto as to obstruct the administration of justice.

Whether the misbehavior was in the presence of the court or so near thereto as to obstruct the administration of justice depends on what acts are relied upon as constituting the contempt. The acts committed at a conference in a hotel in Chicago, nor the acts committed in the Muehlebach Hotel, within a few blocks of the court in Kansas City, were not in the geographical presence of the court. Had these acts gone no further than the bribing of O'Malley and the working out of a corrupt plan of appropriating funds and for using the court to further that corrupt purpose, no direct contempt of court would have resulted. But when these conspirators induced the parties to the suits pending in court to send appellants' emissaries into that court and there, in its geographical presence, to seek by fraudulent misrepresentations to secure the aid of that court to assist them in committing a crime in furtherance of their corrupt and nefarious scheme to purloin $10,000,000 of funds then in the custody of that court, their misbehavior in the very presence of the court obstructed the administration of justice. The acts of their emissaries, who were themselves ignorant that they were being used to further a corrupt scheme, were the acts of appellants. It was the appellants who represented to an unsuspecting court that this so-called settlement "was a good settlement," "a tremendous and splendid settlement from the standpoint of the policyholders"; that it was "the cleanest and most decent and the finest settlement ever made in Missouri." It was appellants who said that O'Malley had specifically requested that his counsel "show this court the motives" which had inspired him to

make this settlement; that he had driven "as hard a bargain as he could" and had made "a settlement which he thinks is clean, fine and decent." The voice was Jacob's voice, though the hands were subtly disguised as those of Esau. Although these emissaries· spoke the words of their masters "trippingly on the tongue," that did not make them words of the speakers. They were merely the mouthpieces of their masters—the Charlie McCarthy, who speaks only the words of Edgar Bergen. The mere fact that the conduct was planned beyond the presence of the court is wholly immaterial. The conspirators must have intended, by their plotting, all natural consequences of their corrupt agreement. Brock v. Hudspeth, 10 Cir., 111 F.2d 447; United States v. Manton, 2 Cir., 107 F.2d 834.

█ The written ·agreement provided that the parties to the pending suits would by their attorneys appear in court and join in asking "appropriate orders for distribution of the impounded money." The overt acts in furtherance of this corrupt agreement constituted misbehavior in the presence of the court. True, Pendergast did not sign the agreement, nor was he present when it was signed, but that is not material because he had already committed himself to the other three conspirators and was bound by whatever they might do in furtherance of that conspiracy. A partnership had been created for the very purpose then being carried out. United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. These acts thwarted and made contemptuous the very function and purpose of the court. A court can not exercise its function in any real sense without adverse parties and without the opportunity of exercising its judicial power to examine into the facts and law and upon them to render judgment. The representation that a fair and honest settlement had been made by the parties was false. It did not result from honest negotiations but was bottomed on bribery, was tainted with fraud and corruption, and was a mere pretense and sham, by means of which to induce the court to enter a judgment in furtherance of the corrupt agreement of the appellants, so that their acts, criminal in fact, might seem to have judicial sanction. This manifestly obstructed justice, and it was intended for that· purpose. Bowles v. United States, 4 Cir., 50 F.2d 848; Conley v. United States,

8 Cir., 59 F.2d 929; Chamberlain v. Cleveland, 1 Black 419, 66 U.S. 419, 17 L.Ed. 93; Sinclair v. United States, 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938, 63 A.L.R. 1258.

Appellants rely strongly upon the case of Nye v. United States, 313 U.S. 33, 61 S. Ct. 810, 817, 85 L.Ed. 1172. In that case an illiterate, feeble-minded litigant—not the court—was overreached and by undue influence induced to send letters to his attorney and to the District Judge, asking dismissal of his suit. This occurred more than 100 miles from the court, and the Supreme Court said: "The evil influence which affected Elmore was in no possible sense in the 'presence' of the court or 'near thereto.'"

No part of Nye's wrongful conduct occurred in the presence of the court and the misbehavior consisted of the "evil influence" exercised by Nye upon Elmore to induce him to dismiss a case pending in a court 100 miles distant. In the instant case, the misbehavior of appellants consisted in "wrongfully, fraudulently, corruptly and unlawfully" inducing the court to enter a decree wrongfully releasing the impounded funds to the appellants. Hence, the "evil influence" was exercised directly upon the court in its presence by the ·agents of appellants. The court was made use of to aid appellants in the commission of a crime. Appellants here deceived the court, not a litigant. The interruption of the orderly conduct of the court's business by a proceeding .brought only to deceive the court and to obtain its aid and apparent sanction in the commission of a crime is, we think, misbehavior in the presence of the court which obstructs the administration of justice. Appellants' purpose was to secure possession of and appropriate these impounded funds. This could only be accomplished by acts committed in the presence of the court. Instead of entering that presence as brigands, armed with pistols and forcibly wresting the funds from the court's custody, they accomplished the purpose by subtler means. The Nye case is therefore readily distinguishable in its facts from the instant case.

█ In criminal law, he who commands or procures a crime to be committed is guilty of the crime; the act is his act, and he is present in purpose and design and acts by his agents. United States v. Gooding, 12 Wheat. 460, 6 L.Ed. 693; Merritt v. United States, 9 Cir., 264 F. 870; Beausoliel v. United States, 71 App.D.C. 111,

107 F.2d 292; State v. Barnett, 15 Or. 77, 14 P. 737; Commonwealth v. White, 123 Mass. 430, 25 Am.Rep. 116; People v. Keller, 79 Cal.App. 612, 250 P. 585; Simpson v. State, 92 Ga. 41, 17 S.E. 984, 22 L.R.A. 248, 44 Am.St.Rep. 75. In the recent case of Beausoliel v. United States, supra [107 F.2d 297], the court said: "In fact, it is a general principle of criminal law that one may be guilty of a crime, where the prohibited act is committed through the agency of mechanical or chemical means, as by instruments, poison or powder, or by an animal, a child or other innocent agent *acting under the direction and compulsion of the accused.*" (Italics supplied.)

We conclude that the misbehavior here was not only such as to obstruct the administration of justice, but it was committed in the presence of the court, and hence, was punishable summarily.

■ 2. It is next urged that the prosecution of the contempt proceeding was barred by the statute of limitations or by laches. Generally speaking, limitation of the time for commencing the prosecution of a criminal charge is purely a matter of statute. United States v. Thompson, 98 U.S. 486, 25 L.Ed. 194. There is confessedly no specific Federal statute of limitations applicable to a prosecution for punishment of a criminal contempt committed in the presence of the court. Here, it is important to bear in mind the distinction between criminal contempt and civil contempt. Criminal contempt proceedings are those brought to preserve the power and vindicate the dignity and integrity of the court and to punish for disobedience of its orders. Civil contempt proceedings, on the other hand, are brought to preserve and enforce the rights of private litigants and to compel obedience to orders and decrees made for the benefit of such litigants. The public is interested in the prosecution of a criminal contempt proceeding, while private parties are chiefly interested in the prosecution of civil contempts which are largely for the enforcement of private rights and remedies. Contempts are further classified as direct and indirect, the test being whether the misbehavior constituting the contempt is committed within or outside the presence of the court.

It is urged that the three year statute of limitations, R.S. Sec. 1044, 18 U.S.C.A. § 582, is applicable, and great reliance is placed upon Gompers v. United States, 233 U.S. 604, 34 S.Ct. 693, 58 L.Ed. 1115, which was a proceeding to punish for contempt not committed in the presence of the court. Putting aside the argument that the misbehavior here complained of was a continuing misbehavior, we think there is no authority sustaining the contention that the three year statute of limitations applies to a criminal contempt committed in the presence of the court. In the Gompers case, where the three year statute was applied, the proceeding was for the violation of an injunction. The court specifically limited its holding to a contempt not committed in the presence of the court. The court said:

"The inquiry was directed solely with a view to punishment for past acts, not to secure obedience for the future; and to avoid repetition it will be understood that all that we have to say concerns proceedings of this sort only, and further, only proceedings for such contempt *not committed in the presence of the court.*" (Italics supplied.)

The doctrine of the Gompers case is therefore not applicable here. By inference at least, that case holds that the three year statute of limitations does not apply to contempts committed in the presence of the court.

In United States v. Goldman, 277 U.S. 229, 48 S.Ct. 486, 72 L.Ed. 862, and Hart Inv. Co. v. Great Eastern.Oil Company, D. C., 27 F.Supp. 713, both cited by appellants, the court followed the Gompers case. The Goldman case dealt with the violation of an injunction, as did also the Hart case. In the Hart case, decided by a District Court, the court held that no contempt had been committed. Whatever was said by the court in that case as to the applicability of a statute of limitations was therefore dictum.

In State ex rel. Wright v. Barlow, 132 Neb. 166, 271 N.W. 282, 285, the Supreme Court of Nebraska considered a contention that the Nebraska criminal statute of limitations was applicable to a contempt proceeding. The court, among other things, said: "The defendant contends that the prosecution was barred on counts 3 and 10 for the reason that the acts charged as a criminal contempt occurred more than 18 months before this suit was commenced, it being the statutory period in which a person may be prosecuted for a misdemeanor or an indictable offense below the grade of a felony. Comp.St.1929, § 29-110. This theory is based on the proposition that the Legislature has provided that any person violating the statutory requirements for ad-

684

mission to the bar, as provided in section 7-101, Comp.St.1929, shall be deemed guilty of a misdemeanor. It must be borne in mind, however, that an act denounced by statute as a crime may constitute a contempt of court even if the offender could be prosecuted under a criminal statute. Comp.St.1929, § 20-2123; State v. Barlow, supra [131 Neb. 294, 268 N.W. 95]. We have searched in vain for any statute limiting the time in which an action charging criminal contempt can be maintained. Therefore, unless there is a showing of special circumstances by which delay in instituting the suit has prejudiced the rights of the defendant, the action is not barred by lapse of time."

 It is here to be observed that the suits in which this contempt occurred were still pending, and the trials were still in progress at the time these proceedings were commenced. Jurisdiction to punish for misbehavior constituting criminal contempt committed in the presence of the court continued until the trial of the suits was fully terminated. Ex parte Terry, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405; In re Maury, 9 Cir., 205 F. 626, 629; In re Cary, 165 Minn. 203, 206 N.W. 402. The court specifically found that "the deception was a continuing deception, was intended to exert its deceiving, pernicious and poisonous influence indefinitely, and until and unless discovered by the court. The deception was fortified and renewed by affirmative supplemental acts of deception committed as late as March, 1939." [39 F.Supp. 189, 191.]

 The court retained jurisdiction to punish this contempt during all the time the case was pending before it undetermined, and the affirmative supplemental acts of deception as found by the court were committed as late as March, 1939, while the formal proceedings were instituted July 13, 1940. We conclude that the three year statute of limitations was not applicable as a matter of law, and it appears as a fact that the litigation was still pending and undetermined when the information was filed.

 It is contended in this connection that the proceeding is barred by laches. Mere delay in instituting the proceeding does not constitute laches, unless the delay is prejudicial to defendant. Appellants have not been prejudiced by the delay. While this is a direct contempt, it must be borne in mind that the contemptuous character of the conduct was not discovered until May, 1939, at the earliest. It was not discovered because it was concealed by appellants. The defense of laches is without merit.

 3. Indictments for conspiracy were filed against appellants on July 13, 1940. These indictments covered substantially the same acts as those made the subject of the charge of contempt. After a jury was sworn, the Government entered a nolle prosequi, and appellants contend that the prosecution of this proceeding subjects them to double jeopardy. In the criminal cases appellants asserted their right to immunity from prosecution because of an agreement entered into with the United States District Attorney before they pleaded guilty to certain tax evasion charges. Appellants filed pleas in bar, pleas in abatement, motions to quash and to dismiss the prosecution, all based upon the agreement not to prosecute. The nolle prosequi having been entered on the demand of the appellants, double jeopardy did not result, even if the indictments were for the same offenses as charged in the instant proceeding. Craig v. United States, 9 Cir., 81 F.2d 816. The charges in the indictments, however, were not the same as those involved in the instant proceeding. One charged a conspiracy in violation of Section 88, Title 18 U.S.C.A., to commit an offense against the United States in violation of Section 241, Title 18 U.S.C.A., by endeavoring to obstruct justice. The other charged a conspiracy in violation of Section 88, Title 18 U.S.C.A., to defraud the United States by interfering, obstructing and impeding, and endeavoring to obstruct, interfere with and impede by dishonest means and by fraudulent and corrupt agreements the orderly and lawful functions of the Judicial Department of the United States Government. Punishments for contempt of court and on conviction under indictment for the same acts are not within the protection of the constitutional inhibition against double jeopardy. Acts of misbehavior, though constituting violation of the criminal law, may also constitute contempt of court if committed in the presence of the court. Merchants' Stock & Grain Co. v. Board of Trade, 8 Cir., 201 F. 20. The plea of double jeopardy can not prevail.

 4. It is urged that appellants were immune from prosecution for contempt because of their agreement with the United States, entered into as an inducement to their entering pleas of guilty to

tax evasion charges, that they should not be further prosecuted. The power to punish for contempt is inherent in and inseparable from the court hearing a cause. Public justice and the reign of law demand that the court hearing a cause shall exercise its jurisdiction untrammeled by the action of another branch of the government. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A., N.S., 874. The District Attorney had no authority to bargain away this power of the court. United States v. Ford, 99 U.S. 594, 25 L.Ed. 399; State v. Guild, 149 Mo. 370, 50 S.W. 909, 73 Am.St.Rep. 395. The court in entering sentence in the tax evasion cases, appears to have taken from the record any claim of the appellants to equitable favor on the theory that punishment had been meted out commensurate with their many offenses. Judge Otis said (United States v. Pendergast, D.C., 28 F. Supp. 601, 605): "When a defendant has been charged with a given crime and has entered a plea of guilty to that charge, the punishment assessed should be for the crime charged, and that only. If the crime charged is, as here, attempted tax evasion, the punishment should be for attempted tax evasion."

■ It is clear from the record that the judges of the three-judge court were ignorant of the "agreement," until a telegram from the United States Attorney, dated November 19, 1940, was made public at the trial on the two indictments filed by direction of the court. The plea of immunity was properly denied.

■ 5. It would serve no useful purpose to consider in detail the alleged prejudice or prejudgment of issue by the judges before whom this proceeding was tried. The facts present no real issue. The applicable law was clearly considered. United States v. Pendergast, D.C., 39 F. Supp. 189. There was no prejudgment of guilt in any remarks the court made directing contempt proceedings to be commenced. Charges to the grand jury in the proceeding commenced by the indictment for conspiracy were all hypothetical. The court indicated that to the grand jury, and no animus against the defendants in the cases was shown. Judges may, and indeed must, make rulings as matters present themselves, and having done so are not subject to a charge of prejudice. Ryan v. United States, 8 Cir., 99 F.2d 864. The performance of duty in making findings of fact and decrees in the insurance rate litigation setting aside the settlement decrees for bribery and fraud, can not be accepted as indicating prejudice toward appellants. Appellants have not attempted to show that the evidence would warrant any other conclusion than that reflected in the court's findings. Their complaint of prejudgment of "factual issues" can not be sustained.

■■ 6. Although appellants sought and secured the aid of the three-judge court in furtherance of their fraudulent scheme to steal $750,000 of the money impounded by that court in the insurance rate litigation, they now assert that their acts did not constitute contempt of that court because the court lacked jurisdiction to hear and determine the original insurance rate cases. As has already been observed, the court granted an interlocutory injunction on condition that the increase in the premiums be impounded and held in the custody of the court pending the determination of the litigation. It is therefore argued that the court was without jurisdiction to cause these funds to be impounded, and hence, the appellants might deal with them with impunity. Even though the court had exceeded its jurisdiction, still contemptuous misbehavior such as this, designed to make the Judicial Department of the Government an implement of fraud and corruption, can not be excused, protected or palliated by a suggestion that the court whose jurisdiction was invoked was without jurisdiction. The element of contemptuous disrespect was manifestly present, whatever the extent of the court's jurisdiction may have been. This is not a contempt for violation of the court's order or decree entered in the interest of an individual, nor was the court wholly lacking in jurisdiction. It was a court legally constituted. The appellants marshaled their forces, made their corrupt agreements, and proceeded to lay corrupt hands on funds in the custody of that court through the instrumentality of a decree of the court entered in good faith on its part and in the belief that it was exercising the judicial function with honest litigants before it. Confessedly, jurisdiction of the subject matter can not be conferred by consent, but where the court has general jurisdiction over the subject matter and the jurisdiction of a particular case is dependent upon the existence of particular facts, the jurisdiction may be waived by failure to make timely and specific objections. United

States v. Kiles, 8 Cir., 70 F.2d 880. If honest litigants are to be held to such a rule, certainly appellants must submit to the same rule. It would be perversive of right and justice to say that appellants as malefactors should not be held to the position they took when they invoked the power of the court to deal with these funds.

The question of jurisdiction of the injunctional litigation is not appropriately raised by the appellants. Their interest in that litigation was purely commercial. It was limited to the fact of a vast sum of money deposited in court subject to their hidden fraudulent contrivances. Even if the court lacked jurisdiction of the subject matter, it was its duty as a court to protect a fund accumulated as a result of its orders, and to see that it reached the proper hands, and hence, it had jurisdiction to enter such orders as were necessary to distribute the impounded funds even though the court exceeded its jurisdiction in impounding the funds. American Constitution Fire Assur. Co. v. O'Malley, 342 Mo. 139, 113 S.W.2d 795.

We do not therefore think it necessary to give searching consideration to the question of the court's original jurisdiction. Such jurisdiction should be determined by the allegations of the bills of complaint filed by the insurance companies. Mosher v. City of Phoenix, 287 U.S. 29, 53 S.Ct. 67, 77 L.Ed. 148; Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L. Ed. 375. These bills prayed for an interlocutory injunction and for a permanent injunction "suspending or restraining the enforcement, operation or execution" of certain specifically mentioned statutes of Missouri, "by restraining the action of an officer of such state in the enforcement or execution of such statutes," and "in the enforcement and execution of an order made by an administrative board or commission." The officers referred to were the Superintendent of Insurance and the Attorney General, who were alleged to be acting under and pursuant to the statutes of Missouri, and it was alleged that the injunction was sought "upon the ground of the unconstitutionality of such statutes." The statutes referred to were the laws which prescribed the superintendent's authority to regulate insurance rates and the statute authorizing the Attorney General to enforce penalties against the insurance companies and to authorize revocation of the licenses of the insurance companies for bringing suits in Federal courts. These statutes were attacked as being violative of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States. The interlocutory injunction temporarily enjoined the Superintendent of Insurance and the Attorney General from taking any action "to enforce the said statutes, or exercise or use the powers therein purported to be granted," and from "enforcing any orders or directions to said Missouri Inspection Bureau in any wise calculated to enforce or make effective any directions or powers of said statutes aforesaid." We think, under the allegations of the pleadings, the three-judge court was properly convened under the provisions of Section 266 of the Judicial Code as amended, Title 28 U.S.C.A. § 380. The cases came clearly within the provisions of the statute. National Fire Ins. Co. v. Thompson, Supt., 281 U.S. 331, 50 S.Ct. 288, 74 L.Ed. 881; Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659; Herkness v. Irion, 278 U.S. 92, 49 S.Ct. 40, 73 L. Ed. 198.

The decision in Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800, is not to the contrary. The attack there was directed at an alleged illegal exercise of executive authority. The case did not involve the validity of any state statute, but involved only the legality of the Governor's act done pursuant to general provisions of the state constitution and laws conferring executive and military powers.

As the court in the instant case had jurisdiction to grant or refuse the interlocutory injunction, it had jurisdiction, in its discretion, to impose conditions upon granting such injunction. As said in Public Service Commission of Missouri v. Brashear Freight Lines, Inc., 312 U.S. 621, 61 S.Ct. 784, 787, 85 L.Ed. 1083: "A District Court composed of three judges under section 266 of course has jurisdiction to determine every question involved in the litigation pertaining to the prayer for an injunction, in order that a single lawsuit may afford final and authoritative decision of the controversy between the parties."

See, also, Railroad Commission of California v. Pacific Gas & Electric Co., 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319; Sterling v. Constantin, supra; City of Amarillo v. Southwestern Telegraph & Telephone Co., 5 Cir., 253 F. 638.

As the court had jurisdiction at least over the matter of the disposition of the funds impounded, it had jurisdiction to entertain, hear and determine this contempt proceeding. As a court duly established, it had inherent power to punish for the contemptuous misbehavior in its presence, Michaelson v. United States, 266 U. S. 42, 45 S.Ct. 18, 69 L.Ed. 162, 35 A.L.R. 451; Myers v. United States, 264 U.S. 95, 44 S.Ct. 272, 68 L.Ed. 577; Russell v. United States, 8 Cir., 86 F.2d 389.

If, for the sake of argument, it be granted that the proceeding was not such as to require the presence of three judges, this would not affect the court's jurisdiction. If the proceeding was not properly or necessarily a three-judge matter, there would be no direct appeal to the Supreme Court. But if one judge should have heard the contempt cases, certainly the presence of three judges could not have affected the court's jurisdiction, nor have prejudiced the appellants. Three-judge courts in the cases specified were authorized by Congress "to assure more weight and greater deliberation." The three judges have certified as follows: " * * * that every memorandum, order, decree, and judgment in these cases and in the insurance cases * * * embodied the unanimous decision of the judges constituting this court, and that every such memorandum, order, judgment and decree would have been made by any of the judges if the subject matter thereof had separately been submitted to him."

Judge Reeves, who sat throughout as one of the three judges was the judge to whom the insurance rate cases were originally presented. He signed temporary restraining orders based on the complaints. He heard, with the other judges, the contempt cases and rendered judgment in them as one of the three judges. Even if he, or any one judge, should have sat in the contempt proceedings, the presence of the others did not invalidate the judgment nor prejudice appellants. Public Service Commission v. Brashear Freight Lines, Inc., 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083; Healy v. Ratta, 1 Cir., 67 F.2d 554.

In any event, contemptuous acts committed in the presence of the court would be punishable summarily even though unconnected with any matter then under consideration by the court, and regardless of whether the court had jurisdiction of the matter under consideration.

The attempted attack on the jurisdiction of the court is without support in reason or authority.

7. In a contempt proceeding the court may take judicial notice of the proceedings, files and records in the original case out of which the contempt proceeding arose. Schwartz v. United States, 4 Cir., 217 F. 866; Oates v. United States, 4 Cir., 233 F. 201; Bowles v. United States, 4 Cir., 50 F.2d 848. There was a stipulation with reference to certain matters of record but counsel for appellant stated that "this stipulation is not intended to limit anybody." If the appellants could limit the court as to what it should know judicially, they did not attempt so to do in this case. So far as the actual notice taken of records of the court in the insurance rate cases is concerned, not only did the court have the right and power to take such notice, but no prejudice has been shown. Title 28 U.S.C.A. § 391.

The judgments appealed from are therefore affirmed.

RIDDICK, Circuit Judge (dissenting).

In a summary proceeding in the court from which this appeal comes, the appellants were found guilty of contempt of court. There is no question here of the enormity of the crime of the appellants, nor does any one contend that they do not deserve punishment, nor doubt the importance in the due administration of justice of their prosecution as the law directs. But no one will deny the greater importance of the strict observance by federal courts of the limits of their authority fixed by the Congress which created them. The real question on this appeal is the very power of the lower court to proceed in the manner followed in this case. In the words of the Supreme Court of the United States in the Nye case, the question of the power of the federal courts to punish contempts raises matters of grave importance.

The Congress has carefully limited the power of the lower federal courts in cases like the one here. The applicable statutes follow:

"(Judicial Code, section 268.) Administration of oaths; contempts. The said courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority. Such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their

presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts (R.S., § 725; Mar. 3, 1911, c. 231, § 268, 36 Stat. 1163.)" 28 U.S.C.A. § 385.

"(Criminal Code, section 135.) Attempting to influence witness, juror, or officer. Whoever corruptly, or by threats or force, or by any threatening letter or communication, shall endeavor to influence, intimidate, or impede any witness, in any court of the United States or before any United States ·commissioner ·or officer acting as such commissioner, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner. or officer acting as such commissioner, in the discharge of his duty, or who corruptly or by threats or force, or by any threatening letter or communication, shall influence, obstruct, or impede, or endeavor to influence, obstruct, or impede, the due administration of justice therein, shall be fined not more than $1,000, or imprisoned not more than one year, or both (R.S. §§ 5399, 5404; Mar. 4, 1909, c. 321, § 135, 35 Stat. 1113.)" 18 U.S.C.A. § 241.

The statutes, in their present form, derive from an Act of Congress passed in 1831 for the specific purpose of limiting the power of the federal courts to deal with contempts. As originally adopted in 1831, 4 Stat. 487, 488, the Act was entitled "An act declaratory of the law concerning contempts of court." Its legislative history and the cause which inspired its adoption by the Congress are set out in the Nye case and in the authorities mentioned in that opinion. In its original form the Act was in two sections, the first of which, without substantial change, is now § 268 of the Judicial Code. The second section, also without change pertinent to the present case, is now § 135 of the Criminal Code.

The mandate of the Congress as expressed in § 268 of the Judicial Code is that the summary power of the lower federal courts in respect to contempts "shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice." This would seem direct and plain enough standing alone. But the language must be construed in connection with the provision of § 135 of the Criminal Code, historically a part of the same Act,. which is that one "who corruptly or by threats or force, or by any threatening letter or communication, shall influence, obstruct, or impede, or endeavor to influence, obstruct, or impede, the due administration.of justice" in a federal court "shall be fined not more than $1,000, or imprisoned not more than one year, or both." The plain command of § 135 of the Judicial Code is that one guilty of corruptly obstructing or attempting to obstruct justice in a court of the United States shall be tried as criminals are commonly tried, that is, before a jury upon indictment. The section of the criminal code and the section of the judicial code under consideration being derived from the same Act, must be construed together, and so construed § 135 of the Criminal Code sharply delimits the powers of the federal courts under § 268 of the Judicial Code summarily to punish contempts. Beyond question the appellants here were guilty of corruptly obstructing the due administration of justice in a court of the United States, and they were subject to trial and punishment as provided by § 135 of the Criminal Code. But were they also liable to punishment summarily under the provisions of § 268 of the Judicial Code as held in the majority opinion? That they were not is clearly established by the opinion of the Supreme Court of the United States in the Nye case, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172, construing the statutes under discussion.

In the Nye case, Elmore, an illiterate who was feeble in mind and body, as administrator of the estate of his son, brought an action in the federal District Court against Council and Bernard to recover damages for the death of his son. Nye, a son-in-law of Council, and Mayers, a tenant of Nye, neither being a party to the case, fraudulently induced Elmore to ask dismissal of the action. Through the use of liquor and by fraud, they procured from Elmore letters addressed to the district judge and to Elmore's counsel, requesting that the case be dismissed. The letters in question were prepared by a lawyer employed by Nye for the purpose. The same attorney prepared for Elmore a final accounting in the administration of his

son's estate. Nye took Elmore to the state probate court where the final accounting was approved and Elmore was discharged as administrator. Nye paid the costs of this proceeding and transmitted the order of discharge to counsel for the defendants in the case. Elmore's request for dismissal of the case was made on April 19, 1939, and on June 20, 1939, Nye and Elmore's son were examined under oath before the court concerning the circumstances surrounding Elmore's request that his case be dismissed. Doubtless attorneys for the parties were present in the court on this occasion. On August 29, 1939, the defendants moved to dismiss Elmore's action on the ground that he had been discharged as administrator. A hearing was held on that motion at which counsel were present. It is stated in the opinion of the Circuit Court of Appeals (4 Cir., 113 F.2d 1006), and in Note 2 of the opinion of the Supreme Court of the United States, that the citation for contempt issued against Nye and Mayers was caused by the motion to dismiss presented by defendants' counsel. Action on the motion to dismiss was postponed by the court on the request of Elmore's counsel, who conducted an investigation revealing the facts upon which Nye and Mayers were summarily tried and found guilty of contempt.

The District Court found that the acts of Nye and Mayers were done for the express purpose of preventing the prosecution of a civil action in the court and that they intended to and did "obstruct and impede the due administration of justice." Upon appeal to the Circuit Court of Appeals, the judgment of the District Court was affirmed. On certiorari to the Supreme Court of the United States, the judgment was reversed, the Court saying [313 U.S. 33, 61 S.Ct. 812, 85 L.Ed. 1172]: "We granted the petition for certiorari because the interpretation of the power of the federal courts under § 268 of the Judicial Code to punish contempts raised matters of grave importance." In reaching this result, the opinion of the Court in Toledo Newspaper Company v. United States, 247 U.S. 402, 38 S.Ct. 560, 565, 62 L.Ed. 1186, 1187, a case which had been universally accepted for more than twenty years as the leading authority upon the question of the power of the federal courts to deal summarily with contempts, was expressly overruled, and the Court returned to the earlier construction of the Act of Congress which limited the summary power of the lower federal courts in matters of contempt to those instances which occurred in the actual presence of the court, or so near thereto as to interrupt or disturb the orderly discharge of the judicial function.

Of the conduct of Nye and Mayers the Court said: "The acts complained of took place miles from the District Court. The evil influence which affected Elmore was in no possible sense in the 'presence' of the court or 'near thereto'." and "The fact that in purpose and effect there was an obstruction in the administration of justice did not bring the condemned conduct within the vicinity of the court in any normal meaning of the term. It was not misbehavior in the vicinity of the court disrupting to quiet and order or actually interrupting the court in the conduct of its business." The Court cited with approval the case of Ex parte Poulson, 19 Fed.Cas. page 1205, 1208, No. 11,350, decided by a District Court in 1835, in which it was held that the power of the federal courts to deal summarily with contempts was limited "to that kind of misbehavior which is calculated to disturb the order of the court, such as noise, tumultuous or disorderly behavior, therein or so near to it, as to prevent its proceeding in the orderly dispatch of its business"; and to its earlier decision in Ex parte Robinson, 19 Wall. 505, 511, 22 L.Ed. 205, in which the Court expressly held that the power of the lower federal courts to punish summarily for contempts "can only be exercised to insure order and decorum in [court]." And it said "meticulous regard for those separate categories of offenses must be had, so that the instances where there is no right to jury trial will be narrowly restricted."

I perceive no distinction between the Nye case and this case. None is drawn by the majority opinion. The crime of Nye and Mayers was trivial when compared with the crime of the appellants in this case, but that fact alone is not sufficient to change the law applicable to the defendants in both cases. It is conceded in the majority opinion that none of the acts of the appellants which resulted in a dismissal of the insurance rate litigation occurred in the presence of the court within the meaning of the statute, but importance is attached to the fact that counsel representing the parties appeared in court and defended the settlement of the case which the court

was asked to prove. This appearance of counsel and their laudatory remarks concerning the settlement, in the view of the majority, brought the contempt into the presence of the court. But counsel were present in court in the Nye case, advocating a disposition of a suit there pending, which had been arranged by fraud. I cannot conceive that the Supreme Court of the United States overlooked the appearance of counsel in court in the Nye case, if any importance could have been attached to it, when in the words of the Court, it took the case for review because "of grave importance" of the issues involved, and when in deciding those issues, the Court overruled its leading opinion upon the question involved, of more than twenty years' standing. The arguments of counsel were not of consequence in the crime of contempt since by the mere filing of the motion requesting the court's approval of the fraudulent settlement, counsel asserted their belief in its integrity as emphatically as it might be asserted.

The second distinction between the Nye case and the present case attempted by the majority opinion is based on the assertion that in the Nye case, Elmore, a feeble-minded person, was deceived, while here the court itself was deceived. But Nye and Mayers were not punished for deceiving the incompetent Elmore. They were convicted under § 268 of the Judicial Code for attempting to obstruct justice in a federal court. The court had no jurisdiction of Nye and Mayers on a charge of criminally defrauding Elmore, and it did not attempt to exercise such a jurisdiction. The matters involved there, like the matters involved here, concerned the administration of justice in a court of the United States. In the Nye case the attempt was discovered before the court acted. In the present case it was not discovered until after action by the court. But in both cases the parties were equally guilty of the same crime under the same statute. Success is not a necessary element in the crime of obstructing justice. The statute denounces the attempt as well as its accomplishment.

The question of the power of a federal court to act in any case is always a question of importance. It is never, as intimated in the opinion of the District Court, a mere technicality. But in cases in which the question is of the power of the court to punish a criminal summarily in a manner different from that commonly and ordinarily provided for criminal trials, the question of the court's power must be of the gravest importance. The gravity of the crime only adds to the gravity of the question with which the court is confronted. In the administration of justice the courts are in duty bound to exercise the full jurisdiction conferred upon them, and equally bound not to exceed it.

In view of my opinion that the lower court was without jurisdiction to proceed summarily, it is not necessary to discuss other points raised by the appellants. I think the judgment of the lower court should be reversed.